IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION


CURTIS MASON,

        Plaintiff,

  vs.                            Civil Action 2:07-CV-654
                                        Magistrate Judge King

BEXLEY CITY SCHOOL DISTRICT,
*et al.*,

        Defendants.


## OPINION AND ORDER

    Invoking federal and state law, plaintiff alleges that the termination of his employment by the defendant school system was in breach of his contract, whether oral or written, and in violation of public policy. Plaintiff also asserts state law claims of promissory estoppel, conversion, libel and slander, fraud, misrepresentation and intentional infliction of emotional distress. With the consent of the parties, 28 U.S.C. § 636(c), this matter is before the Court on *Plaintiff Curtis Mason's Motion for Summary Judgment*, Doc. No. 48 ("*Plaintiff's Motion*") and the *Motion for Summary Judgment by Defendants*, Doc. No. 51 ("*Defendants' Motion*"). For the reasons set forth below, *Plaintiff's Motion* is **DENIED** and *Defendants' Motion* is **GRANTED in part and DENIED in part.**

## I.    BACKGROUND

### A.    Plaintiff's Education and Employment Background

    Prior to the events giving rise to this litigation, plaintiff attended Dublin High School, but did not graduate and has not obtained his GED. *Deposition of Curtis Mason*, Doc. No. 50, p. 8 ("*Plaintiff*

*Depo.*"); Exhibit 1, attached thereto.  Although he has no formal

education in computer science or management information systems,

plaintiff received networking certifications from Novell and

Brainbench.  *Plaintiff Depo.*, pp. 8-9.  In 1993, plaintiff obtained

his "first real networking job" with Steinhaus Financial Group

("Steinhaus").  *Id*. at 10-11.

**B.    Defendant Bexley City School District Hires Plaintiff;
        Plaintiff's Position as Network Manager**

After Steinhaus terminated plaintiff's employment in 1996,

Defendant Bexley City School District ("Bexley") hired plaintiff that

same year as a network assistant, assigned to work in its technology

department.  *Id*. at 11-12, 64-66.  His employment with Bexley was

terminated on May 21, 2007.

The school year leading up to plaintiff's termination is relevant

to the issues in the instant case.  *Id*. at 11-12; *First Amended

Complaint*, Doc. No. 15, ¶¶ 8-12 ("*Am. Compl.*").  On July 17, 2006,

plaintiff signed a contract of employment for the position of Network

Manager at an annual compensation rate of $80,455.00 ("the contract").

Exhibit 8, attached to *Defendants' Motion*.[1]  The contract contained the

following provision:

> [T]his contract may be nonrenewed by the [Bexley] Board [of
> Education] giving the Employee written notice of its
> intention not to re-employ the person on or before April 30
> of the year in which this contract expires.  This contract
> may be suspended or terminated only after written notice to
> the Employee of the reason(s) for the intended action and
> the Employee is given an opportunity to be heard in response
> before the Superintendent or Board.

_____

[1]Although this document is also attached as an exhibit to other filings
in this case, the Court will continue to refer to this exhibit number for ease
of reference.

Exhibit 8.

Steven Grossman, president of the Bexley Board of Education ("the Board") in 2006, and Christopher Essman, Board treasurer and clerk, signed the contract on July 17, 2006. *Deposition of Steven Grossman*, Doc. No. 43, pp. 7-8 ("*Grossman Depo.*"); *Deposition of Christopher Essman*, Doc. No. 39, pp. 7, 15-16. The term of this contract was to extend from July 1, 2006 through June 30, 2008. *Id.*; Exhibit 8.

Plaintiff reported to Anne Hyland, Director of Curriculum, who in turn reported to defendant Michael Johnson, Superintendent of Bexley City School District. *Plaintiff Depo.*, p. 15; *Deposition of Anne Hyland*, Doc. No. 44, pp. 12-13 ("*Hyland Depo.*"); *Deposition of Michael Johnson*, Doc. No. 42, pp. 10, 12 ("*Johnson Depo. I*"); *Affidavit of Plaintiff Curtis Mason*, ¶ 9 ("*Plaintiff Aff.*"), attached to *Plaintiff's Motion*. Plaintiff viewed himself as a supervisor, too, because he supervised a technology department employee, John Ribble. *Id.* at 15. Plaintiff also supervised another technology department employee, Pam Moenter. *Deposition of Anne Hyland*, Doc. No. 44, p. 26 ("*Hyland Depo.*").

As Network Manager, plaintiff's duties included maintaining security, monitoring and evaluating hardware and software, creating images to be distributed at work stations, discovering new technologies at trade shows and learning how to implement those technologies, backing up the network, providing internet access and content filtering and managing email. *Plaintiff Depo.*, pp. 13-15.

In this position, plaintiff worked approximately 35 to 45 hours per week. *Id.* at 17-18. Sometimes he worked from home. *Id.* at 18-19. On other occasions, he was required to be at the school after hours,

which usually occurred when a hard drive in a server crashed and plaintiff needed to restore the information to a new drive. *Id*. at 22-26.

## C. Study of Bexley's Technology Department and Recommendations

In August 2006, a number of conflicts within in the school district prompted Defendant Johnson to seek an evaluation of Bexley's technology department. *Johnson Depo. I*, p. 16. During the same month, he sought permission from the Board to retain an expert to determine the root causes of the conflicts, which related to user needs and platform abilities. *Id*. at 16-17. The Board passed a resolution and circulated a request for proposal ("RFP"). *Id*. at 15-16. Defendant Johnson and the Board wanted an impartial individual who had a clear understanding of their needs to conduct the evaluation. *Id*. at 15. Because they did not want a desire for prospective financial gain to motivate the study's recommendations, a condition of the RFP prohibited an ongoing relationship with Bexley after completion of the evaluation. *Id*.

In April or May 2007, Bexley hired Haskell Technologies, LLC, ("Haskell Technologies") to conduct a study of Bexley's technology department ("the study"). *Johnson Depo. I*, pp. 14-15; Attachment A to *Affidavit of Louis J. Haskell* ("*Haskell Aff.*"), attached as Exhibit 7 to *Defendants' Motion* ("*Haskell Report*"). In particular, Bexley asked Louis J. Haskell of Haskell Technologies to provide recommendations on the following issues:

- What is the impact of change from a Windows ME to Linux computing environment in terms of both demands on the network and on personnel resources, now and into the future?

4

- What skills are needed in the Technology Department to support the district's environment?

- Are additional staff needed by the Technology Department to support current and future technology initiatives? Is there an industry standard ratio of technology support to user base or to number of workstations that would serve as a guide?

- Is there a recommended organizational structure for the Technology Department that will best support the strategic direction of the district?

- What skills and abilities would be needed to provide overall leadership for the technology department such that both strategic and support interests can be addressed?

- What is the general cost of recommendations if they were to be implemented?

*Haskell Report*, p. 2.

In conducting the study and forming his opinions, Mr. Haskell interviewed 27 Bexley employees, including plaintiff and the rest of the Information Technology ("IT") staff. Introductory language to *Haskell Report* ("*Haskell Report Intro.*"), ¶ 2; *Plaintiff Depo.*, pp. 44-45. At the time of the study, there were four full-time IT staff members and one full-time contractor. *Haskell Report*, p. 7. Mr. Haskell also reviewed, *inter alia*, "[a]ll available documentation provided by the IT staff on the computing environment in the Bexley City School District[.]" *Intro. to Haskell Report Intro.*, ¶ 2.

As a result of his research, Mr. Haskell shared his observations, which included criticisms of the IT staff, its operations and the computing environment. *Haskell Report*, pp. 8-10. These criticisms lead to Mr. Haskell's identification of three problems with Bexley's computing environment:

1. **A stronger set of technical and management skills is needed in the IT group.** A stronger customer focus

5

from IT staff toward users is needed to best assess
and prioritize user needs. Broader technical skills
are needed to support the move to open source
software.[2]

2. **Communications between the IT staff and the user
   community is very strained.** There must be a strong
   partnership between IT staff and users to plan a path
   toward a better technology infrastructure.

3. **The current computing environment is not stable.** All
   parties mentioned a degree of frustration with their
   daily use of technology. A strong effort is needed to
   stabilize the current environment as a top priority.

*Haskell Report*, p. 11. As to the first issue, Mr. Haskell

specifically noted that "[t]he formal technical background of the IT

staff is below that of typical professional organizations. A more

technically skilled staff is needed to be able to both design and

troubleshoot an environment as complex as the [Bexley] environment."

*Id*. at 9.

Mr. Haskell recommended some changes. *Id*. First, he advised

that a "Technology Director" position be created and staffed:

This person would report to the Superintendent and be
responsible for leading all of the technology and computing
work at [Bexley]. The current IT staff would report to this
person. The position is a dual role of manager and a hands-
on role providing technical depth to architect, design,
setup, and operate major portions of the computing
infrastructure. A strong and broad mix of skills is needed
for this position:

–      Ideally, the person should have a minimum BS in CS or
       MIS background with 5-10 years of experience in IT,
       with at least several years in a management position.
       . . .

---

[2]An "open source" application means that "others [a]re free to copy the
source code and distribute it with or without modifications." *Davidson &
Assocs. v. Jung*, 422 F.3d 630, 637 (8th Cir. 2005). According to Mr. Haskell,
"[m]any school systems across the USA and the world are leveraging open source
to both cut costs and provide a very effective computing environment."
*Haskell Report*, p. 10.

- Strong people skills are a must and will be needed immediately to address the communication issues between IT and the user community. . . .

- This person must also be a visionary, proposing new ideas and strategies to the education staff to make both revolutionary and evolution changes. . . .

- Strong business, planning, and budgeting skills are necessary to provide detailed plans within budget and to track the rollout of plans through to implementation.

The staffing of a Technology Director is a top priority to provide both management and technical leadership. . . .

*Id*. at 11-12.

Second, Mr. Haskell recommended that the current computing environment be stabilized:

There must be a joint plan for each school building agreed upon and prioritized with the aid of the user communities. While there have been many pleas for more staffing in IT group, a true understanding of the nature of issues faced by IT is required before new staff dedicated to repair can be justified. . . . A short technical assessment of the major issues is needed to truly understand the nature of the instability in the current environment. Once this is done, a plan can begin to develop specific actions in different areas to rebuild user confidence in the computing environment.

*Id*. at 12. Finally, Mr. Haskell recommended a specific, detailed plan for moving to a new operating system and open source. *Id*.

After reviewing the results of the study, Defendant Johnson concluded that "we really needed to find a different way of organizing the school district so that the needs of the users in the district were being met. . . and under the current system it wasn't going to happen." *Johnson Depo. I*, p. 31.

D. **Administrative Personnel Suspension Policy "Abolishes" Plaintiff's Position**

On approximately April 30, 2007, Defendant Johnson emailed a copy

of a proposed administrative personnel suspension policy ("proposed suspension policy") to plaintiff and others. Exhibit 2, attached to *Defendants' Motion* ("Johnson E-mail dated April 30, 2007"); *Mason Depo.*, pp. 46-47. The email directed the recipients to review the proposed suspension policy and to provide feedback to Defendant Johnson. Johnson E-mail dated April 30, 2007; *Mason Depo.*, p. 47. Although plaintiff did not understand the subject of the email when he received it, he did not contact Defendant Johnson to determine why Defendant Johnson sent it to him. *Mason Depo.*, pp. 47-48. Instead, plaintiff disregarded Defendant Johnson's email, did not review the proposed suspension policy and did not provide any feedback regarding the policy. *Id.*

On May 7, 2007, at 6:30 p.m., the Board held a special meeting[3] to address, *inter alia*, the adoption of the proposed administrative personnel suspension policy ("the special meeting"). *Johnson Depo. I*, pp. 31-32; minutes from special meeting of May 7, 2007 ("*Special Meeting Minutes*"), attached as Exhibit 9 to *Defendants' Motion*. Although there was public notice of the special meeting, Defendant Johnson and Defendant Barry Zwick, Bexley's Director of Operations, did not advise plaintiff specifically of the special meeting. *Johnson Depo. I*, pp. 31-32; *Zwick Depo.*, p. 19. Defendant Johnson is not aware that anyone provided notice to plaintiff and plaintiff did not know that the special meeting had been scheduled. *Id.* at 32; *Plaintiff Depo.*, p. 87; *Plaintiff Aff.* ¶ 20.

---

[3]Regular school board meetings are held on the third Monday of each month; all other board meetings are considered special. *Deposition of Barry Zwick*, Doc. No. 38 ("*Zwick Depo.*"), p. 18.

During the special meeting, which lasted approximately 45 minutes, the Board considered and resolved, *inter alia*, the following:

**WHEREAS:** Section 3319.171 of the Ohio Revised Code[4] allows a board of education to adopt a policy on the suspension of administrators and other employees employed pursuant to Section 3319.02 of the Ohio Revised Code;[5]

**WHEREAS:** The Board is required in developing such a policy to obtain input from administrators who would be covered by the policy;

**WHEREAS:** The Superintendent on behalf of the Board of Education circulated a copy of a proposed Administrative Personnel Suspension Policy and asked for input from such administrators;

**WHEREAS:** Several administrators did provide comments and other input on the proposed policy being developed;

---

[4]This statute provides, *inter alia*:

Notwithstanding section 3319.17 of the Revised Code, the board of education of a city, local, exempted village, or joint vocational school district or the governing board of an educational service center may adopt an administrative personnel suspension policy governing the suspension of any contract of employment entered into by a board under section 3319.02 of the Revised Code. If a board adopts a policy under this section, no contract entered into by a board under section 3319.02 of the Revised Code may be suspended except pursuant to the policy. If a board does not adopt such a policy, no such contract may be suspended by a board except pursuant to section 3319.17 of the Revised Code.

O.R.C. § 3319.171(A).

Section 3319.17 governs statutory reductions in teacher force and partial suspension of teacher contracts. More specifically, "R.C. 3319.17 specifies three occasions when boards of education may decrease the number of teachers in their employ due to circumstances beyond the boards' and the teachers' control." *Dorian v. Euclid Bd. of Educ.*, 62 Ohio St.2d 182, 184 (1980).

[5]O.R.C. § 3319.02 governs the employment of, *inter alia*, school district administrators. As discussed *infra*, this section permits suspension of administrators pursuant to O.R.C. § 3319.171. O.R.C. § 3319.02(C). This statute also provides procedures relating to evaluations, renewal or nonrenewal of a contract and reemployment.

**WHEREAS:** The Board has considered and taken such input into account in developing an Administrative Suspension Policy; therefore, be it

**RESOLVED:** By the Bexley City School District Board of Education that an emergency is declared and a second reading of the proposed Administrative Personnel Suspension Policy is waived; be it further

**RESOLVED:** That, pursuant to Section 3319.171 of the Ohio Revised Code and the recommendation of the Superintendent, the attached Administrative Personnel Suspension Policy is approved and adopted; be it further

**RESOLVED:** That the attached Administrative Personnel Suspension Policy replaces and supersedes any and all policies and regulations of the Board of Education or administration that are inconsistent with its terms.

*Johnson Depo.* I, pp. 32-33; *Special Meeting Minutes*, pp. 1-2;

*Administrative Personnel Suspension Policy*, attached as Exhibit 10 to

*Defendants' Motion* ("Administrative Personnel Suspension Policy" or

"Suspension Policy").

In light of the above and the *Haskell Report*, the Board resolved

to abolish plaintiff's position:

**RESOLVED:** by the Board of Education of the Bexley City School District that the position of Network Systems Manager is no longer needed due to the need for a position with higher skills as recommended by a consultant; and that the position of Network Systems Manager, being no longer needed, is abolished, effective at the close of business on May 21, 2007; now, be it further

**RESOLVED**: that the contract of Curtis Mason as Network Systems Manager is, pursuant to the Board's Administrative Personnel Suspension Policy, suspended, effective at the close of business on May 21, 2007; now be it further

**RESOLVED:** that the Board shall pay its share of the cost of health insurance benefits for Curtis Mason

through the month of June 2007 if said employee
timely pays his share of such cost; now, be it
further

**RESOLVED:**   that the Superintendent shall provide written
notice to Mr. Curtis Mason of the adoption of the
Resolution.

*Special Meeting Minutes*, pp. 2-3.  With the abolition of plaintiff's

position, an independent contractor, Jim Foster was to assume the

Network Manager duties in the interim.  *Johnson Depo. I*, p. 57.

### E.   Plaintiff's Access to Computer System Is Terminated

Following the special meeting, Defendant Johnson wanted to assure

that Bexley's computer system was secure.  *Johnson Depo. I*, pp. 33-36,

76, 92-93.  Dr. Hyland and Defendant Zwick were instructed to secure

the computer system, which involved terminating plaintiff's access to

the system.  *Johnson Depo. I*, p. 33; *Zwick Depo.*, pp. 88-89.  CSC, a

third party contractor previously hired by Bexley, assisted in

terminating plaintiff's system access after the special meeting.

*Johnson Depo.*, pp. 33-34; *Zwick Depo.*, pp. 88-90; *Hyland Depo.*, pp.

35-36.

### F.   Plaintiff's After-Hours Entry Into Bexley School Building

Later in the evening on May 7, 2007, plaintiff attempted to log

into Bexley's computer system from his home in Marysville, Ohio.

*Plaintiff Depo.*, pp. 87-88; *Plaintiff Aff*. ¶¶ 21-22.  After several

unsuccessful attempts, plaintiff assumed that there was a problem with

the server.  *Id*.

Around 10:30 or 11:00 that evening, plaintiff's current wife,[6]

---

[6]Plaintiff's marriage to his former wife, Janet, was dissolved in 2006
while he was a Bexley employee.  *Plaintiff Depo.*, pp. 111-115; Exhibit 6,
attached to *Defendants' Motion*.

Amy Mason, drove him to the Bexley school building and accompanied him into the building. *Plaintiff Depo.*, pp. 88-91; *Plaintiff Aff.* ¶ 23. Once there, plaintiff found that he could not log into the server and he "assumed that a student had hacked into the network and changed the administrator password[.]" *Plaintiff Depo.*, pp. 88-89, 91-92. Plaintiff decided that he "was going to have to restore files in order to regain control over the network." *Id*. at 89, 92. Plaintiff locked backup tapes in his file cabinet and removed the hard drive from his computer, which contained all of the administrative utilities that he needed to restore the network to its normal operation. *Id*. at 92-94. Plaintiff decided to take the hard drive with him when he left the premises that night so that he could use his home computer to ensure that everything stored on the hard drive was intact. *Id*. at 93-94. He handed the hard drive to his wife and told her to put it in her purse. *Id*. at 95-96.

> **G.** **Defendant Johnson Notifies Plaintiff of Abolished Position**

Early on May 8, 2007, Defendant Johnson was notified by telephone that his position had been abolished, effective immediately. *Johnson Depo. I*, pp. 36-38; *Plaintiff Depo.*, pp. 48-54. Defendant Johnson advised plaintiff that he was not permitted on school premises absent permission from Defendant Johnson. *Johnson Depo. I*, p. 38; *Plaintiff Depo.*, pp. 48-49. Defendant Johnson further advised plaintiff that he would receive ten days administrative leave paid time and that arrangements would be made for plaintiff to return school property in his possession, including keys and school badge. *Plaintiff Depo.*, pp. 51-52. During the call, plaintiff did not mention that he recently had removed the hard drive from his school computer. *Johnson Depo.*,

pp. 46-47.

After this short telephone conversation, plaintiff began to shake
and turn pale; plaintiff's wife called Defendant Johnson and asked if
he was trying to give her husband a heart attack. *Affidavit of
Plaintiff* [sic] *Amy D. Mason* ("*Amy Mason Aff.*"), ¶¶ 3-4, attached to
*Plaintiff's Motion*. Ms. Mason submitted a written public records
request seeking, and ultimately receiving, four items: plaintiff's
contract, the Board resolution abolishing plaintiff's position, the
organizational and staffing assessment for the technology department
and the job description for the position of technology director.
*Plaintiff Depo.*, pp. 55-56.

On that same day, plaintiff received written notice from
Defendant Johnson regarding the termination of plaintiff's position,
which included a copy of the Board resolution that abolished the
position. *Plaintiff Depo.*, pp. 50-51, 53-54; Exhibit 3, attached to
*Defendants' Motion*.

### H.   Bexley Discovers that Plaintiff's Hard Drive Is Missing

In addition, on May 8, 2007, Rick Evans, one of Bexley's
contracted computer technician employees, observed that plaintiff had
tried to log into the system. *Zwick Depo.*, pp. 16-17. Mr. Evans also
noticed that plaintiff's hard drive was missing when he attempted to
log in on plaintiff's computer. *Id*. at 22, 25. Thereafter, Tim
Brunney, Bexley's Director of Building and Grounds, learned that
plaintiff's hard drive was missing. *Id*. at 25. Mr. Brunney reviewed
Bexley's surveillance tapes,[7] which included images of plaintiff. *Id*.

---

[7]Surveillance cameras are located throughout the Bexley school building
and are connected to the computer system. *Zwick Depo.*, pp. 10, 12-13.

at 27.  At approximately 9:30 a.m. or 10:00 a.m., Mr. Brunney notified Defendant Zwick that plaintiff's hard drive was missing; he also showed the surveillance tapes to Defendant Zwick.  *Id*. at 25-26. Defendant Zwick observed plaintiff and a female, who was carrying a purse, walk into the school building from a rear entrance, known as the maintenance doors, and into plaintiff's office at approximately 11:00 p.m.  *Id*. at 27-28.  Plaintiff, who was carrying a bag, and the woman exited the office 40 minutes later.  *Id*.

Shortly thereafter, Mr. Brunney and Defendant Zwick showed these tapes to Defendant Johnson, who also reviewed the footage and learned that the hard drive was missing from plaintiff's school computer in addition to the backup tapes.  *Id*. at 28-29; *Johnson Depo. I*, pp. 39-43.  At that point, Defendant Johnson did not know why these items had been taken; he was concerned about maintaining the integrity of the computer system.  *Id*. at 43.  Neither Defendant Johnson nor Defendant Zwick contacted plaintiff to ask about the missing hard drive and back up tapes.  *Id*. at 42; *Zwick Depo*., p. 31.  Because plaintiff had not mentioned, in their conversation on the previous day, that he had taken any property from the school, Defendant Johnson had concerns about plaintiff's trustworthiness.  *Johnson Depo*., p. 46.

## I.   Bexley Police Department Contacted

At some point on May 8, 2007, Defendant Johnson spoke with a liaison officer with the Bexley police department.  *Johnson Depo. I*, pp. 47-48, 87-89.  Based on this conversation, it was Defendant Johnson's understanding that Bexley would be required to file a complaint before the police would go to plaintiff's home in Marysville to retrieve the property.  *Id*.

## J.    Marysville Police Visit Plaintiff's Home

The Bexley police department asked the Marysville police department to retrieve school property from plaintiff.  Exhibit 1, attached to *Amy Mason Aff*. ("*Marysville Police Summary*"); *Zwick Depo.*, pp. 69, 73.[8]  Plaintiff did not answer the door and instructed his family to be quiet.  *Plaintiff Depo.*, pp. 133-35; *Plaintiff Aff.* ¶ 34; *Amy Mason Aff.* ¶ 6; *Marysville Police Summary*.  Plaintiff did not hear again from the Marysville police after this visit.  *Plaintiff Depo.*, pp. 136-37.

## K.    Bexley Police Report Filed

On May 8, 2007, Defendant Johnson directed Defendant Zwick to file a police report.  *Johnson Depo. I*, p. 87.[9]  On May 9, 2007, Defendant Zwick telephoned the Bexley police department.  *Zwick Depo.*, pp. 32, 34.  Approximately ten minutes after the call, Officer Joseph Wayne arrived at the school to take a report from Defendant Zwick ("the report").  *Id*. at 34-35; Exhibit D, attached to *Complaint* ("*Bexley Police Report*"); *Deposition of Joseph Wayne*, Doc. No. 40, pp. 7-8 ("*Wayne Depo.*").  Based on what Defendant Zwick told him, Officer Wayne reported that

---

[8]There is evidence in the record that the Marysville police arrived at plaintiff's home around 8:00 a.m. on May 8, 2007, which would have been *before* Defendant Zwick filed his report with the Bexley police department on May 9, 2007.  *See Marysville Police Summary*; *Plaintiff Aff.* ¶ 34; *Amy Mason Aff.* ¶ 6.  Regardless of the exact timing, however, it is undisputed that the Marysville police went to plaintiff's home at some point after he took the hard drive home.

[9]Defendant Johnson spoke to plaintiff late in the afternoon of May 8, 2007.  Plaintiff admitted that he had taken the hard drive but represented that he would return it.  *Affidavit of Dr. Michael L. Johnson* ¶ 3 ("*Johnson Aff.*").  Defendant Johnson forgot to mention this conversation to Defendant Zwick when he directed the latter to file a police report.  He explained that he was not in the office on May 9th and was preparing to leave for a conference out of town that day.  *Id*. at ¶ 4.

just prior to letting offender [plaintiff] know he was being
laid off, the employee, who worked in the technology
section, came to the school with his wife at 2252 hours and
left at 2336 hours. This was caught on video tape. The
parties entered the school with a small bag and exited the
school with it as well. On 05/08/07 the school found that
the laid off employee's desk computer at school had it's
[sic] hard drive removed as well as the contents on the
drive.

*Bexley Police Report*. *See also Wayne Depo.*, pp. 9-10. Pursuant to

police policy, the report did not identify plaintiff's name because no

immediate arrest was contemplated. *Wayne Depo.*, p. 11. The reported

crime was classified as "breaking and entering." *Bexley Police*

*Report; Zwick Depo.*, p. 44. In response to inquiry as to whether

Defendant Zwick intended to prosecute plaintiff, Defendant Zwick

responded "undecided" because he was uncertain whether plaintiff had

taken the school property. *Bexley Police Report; Zwick Depo.*, pp. 42,

44. Defendant Zwick also gave Officer Wayne a description of

plaintiff, including age, which Defendant Zwick obtained from

personnel in the payroll department. *Zwick Depo.*, pp. 40-41, 46-48;

*Bexley Police Report*. Defendant Zwick signed the *Bexley Police Report*

after reviewing it. *Zwick Depo.*, pp. 43-44, 50; *Wayne Depo.*, pp. 10-

11. After taking the report, which is a public record and available

on the internet, Officer Wayne had no further involvement in the

incident. *Wayne Depo.*, pp. 12-13; *Plaintiff Depo.*, p. 97.

**L. Plaintiff's Access to Bexley Email Is Temporarily Restored**

On May 8, 2007, Defendant Johnson contacted Pam Moenter, an

employee in Bexley's technology department, regarding plaintiff's

access to his Bexley email address:

Curtis called me late this afternoon and seemed to be
waiving [sic] the white flag. I think that we can quit
treating him as someone who will be a danger to our

16

operations.  I would like to temporally [sic] restore an
EMAIL address for him if possible, so that we can
communicate.  His phone is disconnected and he called me on
his wife's cell phone.

Exhibit E, attached to *Complaint*; *Johnson Depo.* I, pp. 84-87.

### M.   Plaintiff Returns School Property

Sometime on May 9, 2007, plaintiff and Defendant Johnson spoke by
telephone and plaintiff confirmed that he had taken the missing hard
drive to his home.  *Johnson Depo. I*, pp. 39-41; *Plaintiff Depo.*, pp.
82-83.  Plaintiff also advised that he had secured the backup tapes in
the file cabinet.  *Plaintiff Depo.*, p. 143.  Plaintiff met Defendant
Johnson in a coffee shop to return the school property.  *Johnson Depo.*
*I*, pp. 39-42; *Plaintiff Depo.*, pp. 61, 82-83 144-45.

### N.   Bexley Technology Director Hired

After plaintiff's position was abolished, the new position of
technology director was advertised and candidates were screened and
interviewed.  *Johnson Depo. I*, pp. 57-61.  Paul Ross was ultimately
hired to the position.  *Id*. at 57.

### O.   Plaintiff's Final Paycheck and Subsequent Employment

On May 17, 2007, Defendant Johnson contacted plaintiff regarding
his final paycheck.  *Plaintiff Depo.*, pp. 60-61; Exhibit 5, attached
to *Defendants' Motion*.  In calculating the final amount, plaintiff's
COBRA[10] liability and other expenses were deducted from his regular pay
and vacation pay.  Exhibit 5.  After these setoffs were deducted,

---

[10]Plaintiff's separation agreement from his ex-wife, Janet, required
that plaintiff provide health insurance to Janet for the year following the
dissolution.  *Plaintiff Depo.*, pp. 111-15; Exhibit 6, ¶ F, attached to
*Defendants' Motion*.  Accordingly, plaintiff actively sought the continuation
of such benefits after he learned that his position at Bexley had been
abolished.  *Plaintiff Depo.*, pp. 112-13.

17

plaintiff's gross pay was $748.37. *Id*. Not satisfied with this calculation, plaintiff requested reimbursement for unused sick leave and other expenses. *Plaintiff Depo.*, pp. 61-63, 68-74, 110-12. Defendant Johnson indicated that he was open to negotiation, but that plaintiff would have to sign a waiver of liability. Exhibit 5; *Plaintiff Depo.*, pp. 61-62. Plaintiff refused and ultimately secured legal representation. *Plaintiff Depo.*, pp. 62, 72-74.

After his last day of work at Bexley, plaintiff was unemployed for one or two weeks. *Id*. at 33-35. He applied for, and was granted, unemployment benefits for four weeks at the rate of $450.00 per week. *Id*. at 35-36. In June 2007, plaintiff began working as a network engineer for Franklin Computer Services Group. *Id*. at 27-28.

### P. Plaintiff Initiates the Current Litigation

Plaintiff originally filed this action in the Franklin County Court of Common Pleas on June 4, 2007. Doc. Nos. 1-3. On July 10, 2007, defendants removed the action to this Court. Doc. No. 3. Plaintiff filed an *Amended Complaint* on November 13, 2007, raising the claims that are addressed *infra*. Doc. No. 15.

### Q. Evaluations and Notification of Nonrenewal

In December 2007, Defendant Johnson prepared a preliminary evaluation[11] of plaintiff for the 2007-2008 school year ("preliminary evaluation"). *Deposition of Michael Johnson*, Doc. No. 47, pp. 122-23 ("*Johnson Depo. II*"), pp. 106-07, 111, 115-16; Exhibits 2 and 3,

---

[11]This was the first time that Defendant Johnson ever prepared an evaluation for an employee who had been separated from employment. *Johnson Depo. II*, p. 106. However, under the reorganization at the time and date the preliminary evaluation was performed, Defendant Johnson, not Dr. Hyland, would have been plaintiff's direct supervisor. *Johnson Depo. II*, pp. 115-16.

attached to *Plaintiff Aff*.  Defendant Johnson arranged for the

preliminary evaluation, and an accompanying letter, to be hand-

delivered to plaintiff at his then-current job site in Gahanna.

*Johnson Depo. II*, pp. 109-11.  In the accompanying letter, dated

December 12, 2007, Defendant Johnson notified plaintiff of the

preliminary evaluation:

> As you know, you have recall rights under the Board of
> Education's policy on suspension of administrative contracts
> as a job abolishment or layoff.  Therefore, it seems you
> should be evaluated per the time frames of R.C. 3319.02,
> using the same format as last year.  I am attaching your
> preliminary evaluation for the 2007-08 school year.  Dr.
> Hyland completed the written evaluation last year at the end
> of December.  You were only in the District's active
> employment thereafter (prior to your position being
> abolished) for slightly over four months.  Many of the
> ratings and comments from the December, 2006-January, 2007
> written evaluation are incorporated in this year's
> evaluation by reference as though written verbatim.

Exhibit 2, attached to *Plaintiff Aff*.

In addressing the content of the evaluation, Defendant Johnson

referenced defendants' belief that plaintiff had acted in breach of

his obligations by failing to purchase user licenses and by instead

buying "upgrade" user licenses, many of which were useless:

> On October 14, 2007, an attorney for the Board of Education,
> Patrick Schmitz, wrote a letter to your legal counsel
> informing you of the District's belief that you breached
> your obligations as an employee.  You did so by failing to
> purchase user licenses for 539 of the District's computers
> and by purchasing "upgrade" user licenses, at least 275 of
> which are now useless to the District.  These failures
> occurred initially in years prior to 2007, however, they are
> continuing in nature.  They only began to be discovered in
> August 2007 after the District created the new position of
> Technology Director and hired Paul Ross to that position.
> Accordingly, they are addressed in this preliminary
> evaluation.

*Id*.

Finally, Defendant Johnson advised plaintiff that should

plaintiff desire a meeting, he should notify Defendant Johnson to

discuss the evaluation:

> I am mailing this preliminary evaluation to you for your
> review, comments and signature.  Please let me know if you
> desire a meeting with me to discuss this evaluation.
> Otherwise, please sign a copy of it, attach any written
> comments you wish to add, and send it back to me for
> inclusion in your file.

*Id*.  Plaintiff never requested a meeting to discuss the preliminary

evaluation.  Exhibit 3, attached to *Plaintiff Aff.*

On March 12, 2008, Defendant Johnson prepared a final evaluation

and a letter to plaintiff, addressing the contents of the preliminary

and final evaluations, the expiration of plaintiff's contract and the

nonrenewal of the contract ("final evaluation").[12]  *Johnson Depo. II*,

p. 118-21; Exhibit 3, attached to *Plaintiff Aff*.  According to

Defendant Johnson, he prepared the final evaluation even though

plaintiff was already separated from employment because such

evaluation was required:

> Enclosed is your final evaluation.  Your contract as a
> management level employee expires on June 30, 2008.  You
> have the right to meet with the Board of Education in
> executive session to discuss the Board of Education's
> reasons for considering your renewal or non-renewal.  Please
> let me know as soon as possible if you want to meet with the
> Board on this matter.[13]

> Finally, this letter is to notify you that I will recommend
> to the Board of Education on March 17, 2008 the non-renewal
> of any and all contracts that you may have with the school
> district.

Exhibit 3, attached to *Plaintiff Aff.; see also Johnson Depo. II*, p.

---

[12]The letter contains an erroneous date of March 12, 2007; the correct
date is March 12, 2008.  *Johnson Depo. II*, p. 119.

[13]There is no evidence in the record that plaintiff requested a meeting
with the Board.

120 (stating that "this is the second required evaluation and notification").

On March 17, 2008, based upon Defendant Johnson's recommendation, the Board decided not to re-employ plaintiff to the extent that he might have any remaining contractual employment with the board. *Johnson Depo. II*, p. 122-23. In other words, the Board would not renew plaintiff's contract. *Id.* In a letter dated March 20, 2008, Defendant Johnson advised plaintiff of this decision. *Id.* at 122.

## II.    STANDARD

The standard for summary judgment is well established. This standard is found in Rule 56 of the Federal Rules of Civil Procedure, which provides in pertinent part:

> The judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c) (2009). Pursuant to Rule 56(c), summary judgment is appropriate if "there is no genuine issue as to any material fact ...." *Id.* In making this determination, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144 (1970). Summary judgment will not lie if the dispute about a material fact is genuine, "that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986). However, summary judgment is appropriate if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which

that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). The mere existence of a scintilla of evidence in support of the opposing party's position will be insufficient; there must be evidence on which the jury could reasonably find for the opposing party. *Anderson,* 477 U.S. at 251.

The party moving for summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. *Catrett,* 477 U.S. at 323. Once the moving party has met its initial burden, the burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 250 (quoting Fed. R. Civ. P. 56(e)); *Talley v. Bravo Pitino Restaurant, Ltd.,* 61 F.3d 1241, 1245 (6th Cir. 1995) ("[T]he nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial."). "Once the burden of production has so shifted, the party opposing summary judgment cannot rest on the pleadings or merely reassert the previous allegations. It is not sufficient to 'simply show that there is some metaphysical doubt as to the material facts.'" *Gover v. Speedway Super Am. LLC,* 284 F. Supp.2d 858, 862 (S.D. Ohio 2003) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)). Instead, the non-moving party "must -- by affidavits or as otherwise provided in this rule -- set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2).

In ruling on a motion for summary judgment "[a] district court is not ... obligated to wade through and search the entire record for

some specific facts that might support the nonmoving party's claim."
*Gover*, 284 F.Supp. 2d at 862 (quoting *InterRoyal Corp. v. Sponseller,*
889 F.2d 108, 111 (6th Cir. 1989) (internal citation marks omitted)).
Instead, a "court is entitled to rely, in determining whether a
genuine issue of material fact exists on a particular issue, only upon
those portions of the verified pleadings, depositions, answers to
interrogatories and admissions on file, together with any affidavits
submitted, specifically called to its attention by the parties." *Id.*

## III. DISCUSSION

Plaintiff alleges several claims and defendants assert a
counterclaim. Each claim will be addressed in turn.

### A. Plaintiff's Breach of Contract Claim (Second Claim)

The parties do not dispute that Ohio law governs plaintiff's
breach of contract claim. *See also Bamerilease Capital Corp. v.*
*Nearburg*, 958 F.2d 150, 152 (6th Cir. 1992) (Ohio law requires that
contracts be interpreted according to the "law of the place of the
contract's making"). To state a successful breach of contract claim
under Ohio law, a plaintiff must establish (1) the existence of a
contract, (2) performance by the plaintiff; (3) breach by the
defendant; and (4) damage or loss to the plaintiff. *See*, *e.g.*, *Thomas*
*v. Publishers Clearing House, Inc.*, No. 00-3948, 29 Fed. Appx. 319,
2002 U.S. App. LEXIS 2069, at *5 (6th Cir. Feb. 5, 2002) (citing *Doner*
*v. Snapp*, 98 Ohio App. 3d 597, 649 N.E.2d 42, 44 (Ohio Ct. App.
1994)).

In moving for summary judgment on this claim, plaintiff argues
that he was party to a valid two-year employment contract for the

period of July 1, 2006 to June 30, 2008, because it was signed by Mr. Grossman, the Board's president, acting on behalf of the Board. *Plaintiff's Motion*, pp. 10-11. Plaintiff contends that Bexley acted in breach of this contract by failing to notify plaintiff that his contract had been suspended or the reasons for such suspension and by failing to afford him an opportunity to be heard. *Id.*

Defendants also move for summary judgment on this claim, arguing that O.R.C. § 3319.171 permitted the suspension of plaintiff's contract pursuant to the Administrative Personnel Suspension Policy. *Defendants' Motion*, pp. 9-16. Defendants further contend that any contract with plaintiff existed only by operation of law, not by written contract, because (1) the written contract was never adopted by a vote of the Board at a public meeting, and (2) the Board reemployed plaintiff for the 2006-2008 school years as an administrator pursuant to O.R.C. § 3319.02. *Id.*

### 1. Plaintiff's contract

"Ohio boards of education are purely creations of statute." *Brownfield v. Bd. of Educ.*, 56 Ohio App.2d 10, 11 (4th Dist. Ct. App. 1977). Boards of education "must function within the limited powers granted to them by statute." *Hartley v. Berlin-Milan Local Sch. Dist.*, 69 Ohio St.2d 415, 416 (1982). Ohio Revised Code § 3313.33 provides that "[n]o contract shall be binding upon any board unless it is made or authorized at a regular or special meeting of such board." O.R.C. § 3313.33(B). *See also* O.R.C. § 3313.18 In sum, a board of education "is made by the statute of a body corporate, and the contracting of a debt by the board, and the directing the issuing of an order to pay it, are corporate acts which can not be performed by

24

the individual members of the board acting separately." *State ex rel. Steinbeck v. Treasurer of Liberty Twp.*, 22 Ohio St. 144, syllabus (1871). Stated differently, individuals, even a school superintendent or principal acting on conversations with individual board members, cannot contractually bind a school board absent evidence that the board authorized such contract. *See*, *e.g.*, *Wolf v. Cuyahoga Falls City Sch. Dist. Bd. of Educ.*, 52 Ohio St. 3d 222, 223-24 (1990) ("A principal has no authority to bind a school board to a contract."); *Walker v. Lockland Sch. Dist. Bd. of Educ.*, 69 Ohio App.2d 27, 29 (1980) ("The representations of the superintendent, even if based on conversations with individual board members, do not, as a matter of law, meet the statutory requirements [set forth in O.R.C. § 3313.33].").

In the instant case, the parties disagree whether plaintiff had a written contract with the Board or if he simply had a contract based on operation of law. Plaintiff argues that the signatures of Messrs. Essman and Grossman are sufficient to bind the Board and to create a valid written contract, which defendants breached. Plaintiff further contends that the Board approved this contract and that the Board minutes reflect their approval. Defendants, however, take the position that there is no evidence that the entire Board actually approved the contract: the Board "approved the continued employment of Plaintiff, [but] the Board did not approve a written contract for Plaintiff. It is unclear why that was never done, but it was not done." *Reply Brief in Support of Motion for Summary Judgment By Defendants*, Doc. No. 62 ("*Defendants' Reply*"), p. 2 (citing, *inter alia*, O.R.C. §§ 121.22, 3313.20 and 3313.47 (providing, according to

defendants, that "a board of education speaks only through its official actions adopted by a vote of the entire board at a public meeting"). Defendants argue that, because there was no written contract, plaintiff's contract for employment existed only by operation of law and, therefore, the terms of the written contract have no bearing on the litigation.

On July 17, 2006, the Board held a regular meeting ("regular meeting"). *Regular Meeting* minutes attached to *Plaintiff Curtis Mason's Memorandum Contra to Defendants' Motion for Summary Judgment*, Doc. No. 58 ("*Plaintiff's Memo. Contra*") ("*Regular Meeting Minutes*").[14] Messrs. Grossman and Essman and Defendant Johnson were among the attendees at the regular meeting. *Id.* at 1. During the regular meeting, the Board addressed, *inter alia*, the contracts for certain unclassified employees:

> **PERSONNEL** Ms. Peterson moved and Ms. Fishel seconded a motion to approve the following personnel items as recommended by the Superintendent:
>
> \*          \*          \*          \*
>
> 3.   Unclassified Employee's [sic] 2-Year Contract - [124.11 (A)(B)ORC] - July 1, 2006 through June 30, 2008 and to set the salary for the 2006-2007 contract year.
>
>      Karen Armstrong, Accts Payable/Treasurer's Secy $38,980
>      **Curtis Mason**, Network Manager  80,455
>      Sam McMillan - partially funded by Adam Stuart Linhart Memorial / Special Education Part B Funds - 9.5 mos./20 hrs./wk [/] 1,550/mo.
>      Amy Nance, Director of Operation's Secretary 34,760
>      John Ribble, Network Assistant         52,235

---

[14]Plaintiff contends that these minutes "were produced in discovery by Defendants, and are a part of the Court's record[.]" *Plaintiff Curtis Mason's Reply to Defendants' Response in Opposition to Plaintiff's Motion fro Summary Judgment by Defendants*, Doc. No. 61, pp. 2-3 ("*Reply*").

```
        Laurianne Rieser, Payroll              43,305
        Sharleen Stanley, Building Receptionist    22,395
```

*Id.* at 4 (emphasis added).

Because the meaning of the *Regular Meeting Minutes* is not immediately apparent, the Court turns to deposition testimony for further clarification. Mr. Essman testified that the Board did approve plaintiff's contract:

> Q:   And you signed it [the contract] as the Treasurer and Clerk?
>
> A:   Yes.
>
> Q:   When you signed this document, did you sign this contract in good faith with Curtis Mason that you meant what you said in the contract?
>
> A:   I signed it based on the Board of Education passing a motion that they set a salary and approved the two-year contract.
>
> Q:   So the Board of Education approved this contract?
>
> A:   Yes.
>
> Q:   And when did they approve that contract?
>
> A:   July 17th, 2006, I believe.
>
> *          *          *          *
>
> Q:   With respect to Deposition Exhibit No. 9 [the contract], is that a different type of contract? What is that?
>
> A:   This is a contract that we use with administrative staff in the district.
>
> Q:   When you sign a contract as the Treasurer and Clerk, you know, for the Board of Education of the City School District of Bexley, Ohio, do you intend to be bound by that contract?
>
> A:   I truthfully have never thought about what my signature on a contract means other than the Board adopted that contract and I'm signing as Treasurer. I never asked or I don't know the legal- what my legal rights, what I legally signed other than in Ohio, uh,

Board President and Treasurer sign employment
contracts.  But the contract is between the Board of
Education and employee, not with me.

Q:    Well, as the Treasurer/Clerk, is it your intent in
      that position, you, as your official capacity to be
      bound by a contract?

A:    I don't have the authority to take any employment
      action or provide any.  That's not what– my signature,
      I don't believe, is doing that to that contract.

Q:    Well, what's the purpose for you to sign a contract?

A:    State representing the– the Board of Education adopted
      that as the contract, that they approved it.  The
      Secretary of the Board of Education I'm signing it
      saying this is what they approved.

Q:    So when you say that this is what they approved, and
      I'm specifically speaking of the contract, Exhibit No.
      7, uh, on Curtis Mason, that contract and its contents
      there was [sic] approved by the Board of Education; is
      that correct?

A:    The Board minutes reflect certain things in this
      contract, salary, the length of term, the official
      date, and so forth.  The official Board minutes do not
      reflect the language in this contract.  But this is a
      contract used by the school district.

*Essman Depo.*, pp. 20-21, 44-46.

      Similarly, Mr. Grossman also testified that the Board approved

plaintiff's contract:

Q:    And when did you sign that document [the contract]?

A:    The date here is July 17th, 2006.

Q:    And you signed that on behalf of the Board, is that
      correct, --

A:    Yes.

Q:    – of Education for Bexley?

A:    Yes.

*                 *                 *                 *

Q:    Okay.  And when you sign a contract for the Board of

Education, is it your intent to be bound by the
                contract?

        *               *               *               *

        A:      It's my-- It's the intent the school system is bound
                to that contract.

        Q:      And you're acting on behalf of the school system?

        A:      Yes.

        *               *               *               *

        Q:      And you signed [the contract] before the Board of
                Education-- for the Board of Education, I should say?

        A:      Yes.

        Q:      On behalf of them?

        A:      Yes.

        Q:      And this contract was approved by the Board of
                Education for you to sign?

        A:      Yes.

*Grossman Depo.*, pp. 8-10, 13.

        Defendant Johnson did not indicate whether or not the Board

approved the contract:

        A:      I get a salary notice that looks similar to this
                [plaintiff's contract], but this is really the first
                time that I really had a chance to study this
                (indicating).  I know that this document exists.  In
                terms of all the details of it, I can't tell you all
                the details of it.

                *               *               *               *

        A:      . . . I don't take care of this document as an
                administrator.  It is a document that other people use
                for whatever purpose.  I think it's to give people
                salary notice and to make sure that the Treasurer can
                reference something relative to a Board resolution on
                salary and also reference a document for payroll.  But
                I don't see these documents.  I don't keep them in my
                office.  I don't study them.  I don't recommend.

        Q:      Okay.  Well, it's fair to say that this is an official

                                29

document from the Bexley City School District, is it not?

A:    I would say it's an official document.

Q:    Okay.  And this is a document that the Bexley City School District prepared?

A:    It looks like it, yes.

*Johnson Depo. I*, pp. 19-21.

However, there is some evidence that suggests that the Board may not have expressly approved the specific language and scope of the contract because it was simply boilerplate language.  Plaintiff, who did not attend the regular meeting, does not know whether or not the Board approved the language contained in his contract.

Q:    Did you individually negotiate any of these terms in this document with the board of education or with Dr. Johnson?

A:    No, not to my knowledge.

Q:    There was no give and take on the wording of any language here or anything like that?

A:    No.

Q:    Do you have any knowledge that the board of education specifically approved the language of Exhibit A to the complaint [the contract]?

A:    Do I have any knowledge that the board approved it?  I mean, I have that good faith, yeah, that they did approve that.  I mean, the board is who paid my salary.  And they agreed to pay that for the amount of time that they agreed for.  So I got to believe that, yes, the board has-- especially since it's got a board of education president's signature on it.  I got to believe they had involvement in it, yes.

Q:    Do you have any other basis to believe that the board approved the specific language of Exhibit A to the complaint other than what you've just told us?

A:    I don't know enough to answer your question.

Q:    That's fine.  I don't know is an okay answer.

A:      Yeah, I don't know that.

*Plaintiff Depo.*, pp. 159-160.  *See also Hyland Depo.*, p. 94 (agreeing

that a contract such as plaintiff's is a boilerplate form used by the

Board).

        Based on the present record, which is not a model of clarity, the

Court cannot determine with confidence that the Board voted on and

approved the specific terms of plaintiff's contract.  The individual

signatures of Messrs. Grossman and Essman, standing alone, do not

establish the written contract's validity, *see Wolf*, 52 Ohio St. 3d at

223-24; *Walker*, 69 Ohio App.2d at 29, but there is some evidence

suggesting that the Board itself did approve the contract during the

regular meeting.  However, even assuming that the Board formally

approved plaintiff's written contract, the Court concludes that

defendants did not act in breach of the contract, for the reasons that

follow.

### a.      Plaintiff is an "other administrator"

        As noted *supra*, O.R.C. § 3319.02 governs the employment of, *inter*

*alia*, school district administrators.  Under this statute, "other

administrators" are "[a]ny nonlicensed employee whose job duties

enable such employee to be considered as either a 'supervisor' or a

'management level employee,' as defined in section 4117.01 of the

Revised Code."  O.R.C. § 3319.02(A)(1)(b).

        O.R.C. § 4117.01 defines a "supervisor" as

        any individual who has authority, in the interest of the
        public employer, to hire, transfer, suspend, lay off,
        recall, promote, discharge, assign, reward, or discipline
        other public employees; to responsibly direct them; to
        adjust their grievances; or to effectively recommend such
        action, if the exercise of that authority is not of a merely
        routine or clerical nature, but requires the use of

independent judgment[.]

O.R.C. § 4117.01(F).  As discussed *supra*, plaintiff supervised or "responsibly directed" other employees, including Mr. Ribble.  *Mason Depo.*, p. 15.  As Network Manager, plaintiff considered himself a supervisor and he was viewed as the *de facto* head of the IT department.  *Id.; Haskell Report*, p. 7.  Giving the statutory definition of "supervisor" the liberal construction due it, *cf.* O.R.C. § 4117.22;[15] *City of Hamilton v. State Employment Relations Bd.*, 70 Ohio St. 3d 210, 213-14 (1994), the Court finds that plaintiff was a "supervisor"[16] within the meaning of the statute.  Therefore, O.R.C. § 3319.02 governs plaintiff's contract.

   In reaching this conclusion, the Court notes that plaintiff offers no substantive argument disputing that he was a supervisor and therefore an "other administrator" under O.R.C. § 3319.02(A)(1)(b).  *See, inter alia*, *Plaintiff's Memo. Contra*, p. 11.  Instead, plaintiff

---

[15]"Chapter 4117 of the Revised Code shall be construed liberally for the accomplishment of the purpose of promoting orderly and constructive relationships between all public employers and their employees."  O.R.C. § 4117.22.

[16]Plaintiff might also properly be considered a "management level employee" within the meaning of O.R.C. § 4117.01, which defines that term as follows:

> an individual who formulates policy on behalf of the public employer, who responsibly directs the implementation of policy, or who may reasonably be required on behalf of the public employer to assist in the preparation for the conduct of collective negotiations, administer collectively negotiated agreements, or have a major role in personnel administration. Assistant superintendents, principals, and assistant principals whose employment is governed by section 3319.02 of the Revised Code are management level employees.

O.R.C. § 4117.01(L).  Plaintiff's duties included evaluating software and discovering and implementing new technologies, *Mason Depo.*, pp. 13-14, which could be construed as formulating and directing the implementation of policy on behalf of Bexley and the Board.

32

simply asserts that "[i]t is curious that the Plaintiff Contract states that he is labeled "Unclassified Employee Contract. (sic) (124.11(A)(B)(ORC)."[17] *Id.* Plaintiff cites to no authority for his suggestion that his status as an "unclassified employee" may somehow preclude his status as an "other administrator." Plaintiff's unsupported assertion is, therefore, unpersuasive.

### b. O.R.C. § 3319.02(C)

Section 3319.02 requires, *inter alia*, that "[t]he board of education or governing board shall execute a written contract of employment with each. . . other administrator it employs or reemploys." O.R.C. § 3319.02(C). As discussed *supra*, the Court will assume that the Board approved and executed plaintiff's written contract.[18] This section provides that "[n]o contract may be suspended except pursuant to section 3319.17 or 3319.171 [3319.17.1] of the

---

[17]This statute

divides the civil service into the classified and unclassified service. Positions in the classified service are those for which merit and fitness can be determined by examination. Employees in the classified service can only be removed for good cause and only after the procedures enumerated in R. C. 124.34 and the rules and regulations thereunder are followed. Positions in the unclassified service require qualities that the General Assembly has deemed are not determinable by examination. *Employees in the unclassified service do not receive the protections afforded employees in the classified service.*

*Yarosh v. Becane*, 63 Ohio St. 2d 5, 9 (1980) (emphasis added). *See also Rose v. Ohio Dep't of Rehab. & Corr.*, 173 Ohio App.3d 767, 774 (10th Dist. Ct. App. 2007) (stating that unclassified employees "may be dismissed from their employment without cause, and are afforded none of the procedural safeguards available to those in the classified service.").

[18]If the Board did not approve the written contract, plaintiff would have a contract by operation of law. *See State ex rel. McGinty v. Cleveland City Sch. Dist. Bd. of Educ.*, 81 Ohio St.3d 283, 287-88 (1998) ("Because the board did not comply with its R.C. 3319.02(C) duty [to execute a written employment contract for each "other administrator], [plaintiff] McGinty was entitled to a contract by operation of law[.]").

Revised Code." O.R.C. § 3319.02(C).

## 2. Plaintiff's suspension pursuant to Administrative Personnel Suspension Policy

Pursuant to plaintiff's written contract, the Board employed plaintiff as the Network Manager "for a period of TWO (2) year(s) commencing on JULY 1, 2006 and continuing through JUNE 30, 2008." Exhibit 8, attached to *Defendants' Motion*. The contract also contains the following provisions:

The Employee [plaintiff] agrees:

1.   To work the required days during the year as established for the position of NETWORK MANAGER by the Board of Education. For the 2006-2007 school year this is 260 days.

2.   To carry out duties and responsibilities of the Board of Education's adopted job description for the position of NETWORK MANAGER and such other duties as may be assigned by his/her immediate supervisor or Superintendent of Schools.

3.   To abide by the rules and regulations of the Board now in effect and such rules and regulations as may be amended or adopted during the term of this contract. The Employee further agrees to abide by all applicable provisions of the Ohio Revised Code now in effect and such provisions as may be amended or enacted during the term of this contract.

4.   That this contract may be nonrenewed by the Board giving the Employee written notice of its intention not to re-employ the person on or before April 30 of the year in which this contract expires. This contract may be suspended or terminated only after written notice to the Employee of the reason(s) for the intended action and the Employee is given an opportunity to be heard in response before the Superintendent or Board.

*Id.*

O.R.C. § 3319.171 provides that a board of education

may adopt an administrative personnel suspension policy governing the suspension of any contract of employment entered into by a board under section 3319.02 of the Revised Code. *If a board adopts a policy under this section, no*

34

> *contract entered into by a board under section 3319.02 of*
> *the Revised Code may be suspended except pursuant to the*
> *policy.*

O.R.C. § 3319.171(A) (emphasis added).  The statute further provides

that such a suspension policy must include, *inter alia*, "[o]ne or more

reasons that a board may consider for suspending any contract of

employment entered into under section 3319.02 of the Revised Code."

O.R.C. § 3319.171(B)(1).  In addition, O.R.C. § 3319.171 requires that

the suspension policy be developed with input from other individuals,

including "other administrators."  O.R.C. § 3319.171(C).

As discussed *supra*, Mr. Haskell's study revealed several

deficiencies in Bexley's IT department, particularly in the education

level and capabilities of the IT staff.  Mr. Haskell therefore

believed, *inter alia*, that a more technically skilled staff with

stronger management skills was needed in the IT department.  *Haskell*

*Report*, p. 9.  He further advised that a position entitled "Technology

Director" be created and staffed and that the person filling that

position should have, *inter alia*, "a minimum BS in CS or MIS

background with 5-10 years of experience in IT, with at least several

years in a management position."  *Id*. at 11.

Based on Mr. Haskell's study, Defendant Johnson recommended that

Bexley implement the Suspension Policy abolishing plaintiff's

position.  On May 7, 2007, the Board adopted an Administrative

Personnel Suspension Policy during a special meeting pursuant to

O.R.C. § 3319.171.  *Special Meeting Minutes; Administrative Personnel*

35

*Suspension Policy*, attached as Exhibit 10 to *Defendants' Motion*.[19]  The

Administrative Personnel Suspension Policy provides, *inter alia*, that

> 1.  The Board, in its sole discretion, may determine to
>     suspend any contract of employment entered into under
>     O.R.C. § 3319.02 for any of the following reasons:
>     financial conditions of the school district; decreased
>     enrollment of pupils in the district, in a school
>     building(s) or a program(s); territorial changes
>     affecting the district; return to duty of regular
>     employee contracted under R.C. § 3319.02 after a leave
>     of absence; closing or suspension of schools; lack of
>     work; abolishment of position(s) due to lack of need
>     or work; or for any other reason that the Board deems
>     in the best interest of the district.

Exhibit 10, p. 1.  The Board then resolved that "the position of

Network Systems Manager is no longer needed due to the need for a

position with higher skills as recommended by a consultant; and that

the position of Network Systems Manager, being no longer needed, is

abolished, effective at the close of business on May 21, 2007."

*Special Meeting Minutes*.

In abolishing his position in this manner, plaintiff complains,

defendants acted in breach of his written contract by (1) not

providing prior written notice of the decision to not re-employ him,

(2) not providing an opportunity to be heard at the special meeting,

and (3) not providing written notice of the reasons for the adverse

action.

As discussed *supra*, plaintiff's contract was entered into under

---

[19]To the extent that plaintiff relies on Dr. Hyland's deposition
testimony reflecting her opinion about an "unusual" suspension policy, such
reliance is misplaced.  Plaintiff offers no authority that Dr. Hyland's
personal opinion of Dr. Hyland, Bexley's Director of Curriculum,is of any
relevance when determining whether the Administrative Personnel Suspension
Policy was properly adopted and whether plaintiff's contract was properly
abolished in light of that policy.  Importantly, plaintiff does not present
any evidence that the Board failed to comply with the statutory requirements
when adopting the Administrative Personnel Suspension Policy.

O.R.C. § 3319.02, which requires that no contract may be suspended except pursuant to O.R.C. § 3319.171.[20]  O.R.C. § 3319.171 does not require notice, an opportunity to be heard or notice of the written reason(s) for the suspension.  Instead, the Board owed plaintiff, an "other administrator," the right to provide input on the administrative personnel suspension policy adopted by the Board.  O.R.C. § 3319.171(C).  Here, plaintiff admits that Defendant Johnson emailed to him a proposed suspension policy and invited plaintiff's feedback.  Accordingly, defendants properly suspended plaintiff's contract pursuant to O.R.C. § 3319.171.

Plaintiff, however, contends that his written contract, specifically paragraph four, entitled him to notice, opportunity to be heard and the written reason(s) for the suspension.  Although the contract does contain this language, it must be read in light of the relevant statutory provisions, namely O.R.C. §§ 3319.02 and 3319.171.  *See* Paragraph 3 of Exhibit 8, attached to *Defendants' Motion* (plaintiff "agrees to abide by all applicable provisions of the Ohio Revised Code now in effect and such provisions as may be amended or enacted"); *Holdeman v. Epperson*, 111 Ohio St.3d 551, 555-56 (2006) ("It is elementary that no valid contract may be made contrary to statute, and that valid, applicable statutory provisions are parts of every contract.") (quoting *Bell v. N. Ohio Tel. Co.*, 149 Ohio St. 157, 158 (1948) (internal quotation marks omitted)).  To the extent that the contract's language conflicts with the applicable statutory

_____

[20]O.R.C. § 3319.02(C) also provides that a contract may be suspended pursuant to O.R.C. § 3319.17, which governs the statutory reduction in force and suspension of teacher contracts.  That provision is not at issue in this litigation.

provisions, that language is invalid. *See*, *e.g.*, *Holdeman*, 111 Ohio St.3d at 555-56; *State ex rel. Freshcorn v. Bd. of Educ.*, 89 Ohio App. 196, 201 (1st Dist. Ct. App. 1951) (stating that pertinent statutes in effect at the time a contract is executed are read into the contract and that the contract must be construed *in pari materia* with the applicable statutes). *Cf. Gillespie v. Hamilton City Bd. of Educ.*, No. CA81-03-0020, 1982 WL 3195, at *1 (12th Dist. Ct. App. Aug. 4, 1982) ("[T]he Ohio Revised Code provides a complete statutory framework governing job security for teachers in Ohio and any contract provision negotiated by the school board and the teachers which conflicts with this framework is invalid."). Here, O.R.C. § 3319.171 does not require that defendants provide notice, an opportunity to be heard and the written reason(s) for the suspension, conflicting with the provisions contained within paragraph four of plaintiff's contract. Because the contract's contradictory provisions must give way to the statutory language of O.R.C. § 3319.171, defendants did not breach plaintiff's contract by failing to give notice, opportunity to be heard and written notice of the reason(s) for plaintiff's suspension.

### 3. Non-renewal of plaintiff's contract

In moving for summary judgment, plaintiff asserts for the first time that his contract was actually renewed and continues in force because he was not provided written notice that his contract was to be suspended or terminated. *Plaintiff's Motion*, p. 11. As an initial matter, a party may not raise a new claim at the summary judgment stage because, *inter alia*, it results in unfair surprise to the opposing party. *See*, *e.g.*, *Tucker v. Union of Needletrades, Indus., &*

*Textile Emples.*, 407 F.3d 784, 788-89 (6th Cir. 2005); *Avery v. Joint Twp. Dist. Mem'l Hosp.*, 504 F. Supp. 2d 248, 251 n.1 (N.D. Ohio 2007).

However, even if the Court considered the merits of plaintiff's claim that his contract was renewed, plaintiff's argument is unpersuasive. First, as discussed *supra*, plaintiff's contract was suspended pursuant to O.R.C. § 3319.171. Second, defendants did in fact provide notice to plaintiff of the non-renewal of his contract on March 20, 2008. *Johnson Depo. II*, pp. 122-23; *Plaintiff's Motion*, p. 11. Moreover, plaintiff's contract provided that it "may be nonrenewed by the Board giving the Employee written notice of its intention not to re-employ the person on or before April 30 of the year in which this contract expires." Paragraph 4 of Exhibit 8, attached to *Defendants' Motion*. Even if the written provisions did not conflict with applicable statutory authority, defendants provided written notice to plaintiff prior to April 30 of 2008, the year that his contract was set to expire. *Johnson Depo. II*, pp. 122-23; Exhibit 8, attached to *Defendants' Motion*.

Accordingly, on plaintiff's second claim of breach of contract, *Defendants' Motion* is **GRANTED** and *Plaintiff's Motion* is **DENIED**.

B. **Plaintiff's Section 1983 / Denial of Due Process Claim (First Claim)**

Plaintiff asserts a claim under 42 U.S.C. § 1983.[21] To state a

---

[21]Section 1983 provides in relevant part:

Every person who under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

colorable claim under § 1983, a plaintiff must allege the violation of a right secured by the constitution or laws of the United States by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996). Because § 1983 is a method for vindicating federal rights, and is not itself a source of substantive rights, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

In moving for summary judgment on claims under § 1983, defendants raise a qualified immunity defense. "The affirmative defense of qualified, or good faith, immunity shields 'government officials performing discretionary functions . . . from [§ 1983] liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan,* __ U.S. __, 129 S.Ct. 808, 815 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "An official may, however, be held personally liable for civil damages for unlawful official action if that action was not objectively reasonable in light of the legal rules that were 'clearly established' at the time it was taken." *Gardenhire v. Schubert,* 205 F.3d 303, 311 (6th Cir. 2000) (citing *Anderson v. Creighton*, 483 U.S. 635, 639 (1987)). "This 'objective legal reasonableness' standard analyzes claims of immunity on a fact-specific, case-by-case basis to determine whether a reasonable official in the defendant's position could have believed that his conduct was lawful, judged from the

42 U.S.C. § 1983.

perspective of the reasonable official on the scene." *Id.* (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)). The defense of qualified immunity protects a government official whether the official's error was "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson,* 129 S.Ct. at 815 (quoting *Groh v. Ramirez,* 540 U.S. 551, 567 (2004) (Kennedy, J., dissenting)).

Ordinarily, application of the doctrine of qualified requires the initial determination whether the plaintiff has alleged a deprivation of a constitutional right and, if so, whether that right was clearly established. *Pearson*, 129 S.Ct. at 815-18.[22]

When determining whether a right is "clearly established," this Court must look first to decisions of the Supreme Court, then to decisions of the United States Court of Appeals for the Sixth Circuit and other courts within this circuit, and finally to decisions of other circuits. *See Daugherty v. Campbell*, 935 F.2d 780, 784 (6th Cir. 1991). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Gardenhire*, 205 F.3d at 311 (citing *Creighton*, 483 U.S. at 640). However, "this not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Creighton*, 483 U.S. at 640 (citations omitted).

Plaintiff asserts a claim under the Due Process Clause of the Fourteenth Amendment. The Due Process Clause provides in relevant

---

[22]*Pearson* also held, however, that this analysis is not to be applied inflexibly. *Id.*

part that no state shall "deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend XIV. "'Those who seek to invoke its procedural protection must establish that one of these interests is at stake.'"  *Bazzetta v. McGinnis*, 430 F.3d 795, 801 (6th Cir. 2005) (quoting *Wilkinson v. Austin*, 545 U.S. 209, 125 S. Ct. 2384, 2393 (2005)).  Therefore, a court addresses two questions in a procedural due process analysis.  *Id.*  "'The first asks whether there exists a liberty or property interest which has been interfered with by the State, the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient.'"  *Id.* (quoting *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989)).  *See also Hahn v. Star Bank*, 190 F.3d 708, 716 (6th Cir. 1999).

Here, plaintiff argues that he is vested with a property interest in his "right of continued employment and/or contractual employment" because he had an "express contract of employment."  *Plaintiff's Motion*, p. 7; *Plaintiff's Memo. Contra*, p. 15.  In support of his position, plaintiff argues that his "suspension" was really a "wrongful termination," based on Defendant Johnson's negative evaluation from the 2007-2008 academic year.  Plaintiff further observes that the Suspension Policy, which affected only him, was not in effect on the day that his contract was signed, but was created on the same day that he was "terminated."  Prior to the "termination," plaintiff contends that he was provided no notice or opportunity to be heard in 2007.  Accordingly, the "notice" that he received in March of 2008 was meaningless because he had already been terminated.

Defendants argue that plaintiff's contract or property interest

was not absolute because it was subject to O.R.C. § 3319.02, which permits employee suspension pursuant to a policy enacted under O.R.C. § 3319.171. The Administrative Personnel Suspension Policy, adopted pursuant to O.R.C. § 3319.171, provides the Board with wide latitude in establishing reasons for non-disciplinary suspensions and did not entitle plaintiff to notice and opportunity to be heard prior to suspension. Defendants contend that a suspension pursuant to O.R.C. § 3319.171 does not violate due process rights. As to plaintiff's contention that he was terminated for disciplinary reasons, defendants argue that plaintiff confuses a non-renewal without cause, termination for cause and a non-disciplinary abolishment of position and suspension.

Defendants' arguments are well-taken. First, plaintiff's interest in his employment, even if it was memorialized in a written contract approved by the Board, is subject to, and limited by, O.R.C. §§ 3319.02 and 3319.171. As discussed *supra*, the Board properly adopted a suspension policy pursuant to section 3319.171, which resulted in the abolishment of plaintiff's position and suspension. Although plaintiff argues that the suspension was really a disciplinary termination, plaintiff's argument in this regard is without merit. The Board's decision to abolish plaintiff's position, and subsequent suspension, was based on Mr. Haskell's study of Bexley's technology department, not on Defendant Johnson's subsequent evaluation of plaintiff. Mr. Haskell interviewed dozens of employees, including the IT employees, and made several recommendations and criticisms, including a need for a stronger set of technical and management skills in the IT group. Mr. Haskell advised, *inter alia*,

43

that a new position, Technology Director, be created and that the person filling this position should have at least a bachelor's degree. Plaintiff, who did not graduate from high school and who has not obtained his GED, was not qualified for the new recommended position. Accordingly, the Board abolished his position and suspended plaintiff because of "lack of need," which was one of the many reasons justifying suspension in the Suspension Policy.

As discussed *supra*, plaintiff's contract was limited by statute. *Cf. State ex rel. Donah v. Windham Exempted Village Sch. Dist. Bd. of Educ.*, 69 Ohio St.3d 114, 116 (1994) ("contracts of 'other administrators' are always limited contracts"). Accordingly, plaintiff has failed to establish a constitutionally protected property interest in continued employment under these circumstances that entitled him to notice or opportunity to be heard prior to his suspension pursuant to O.R.C. §§ 3319.02 and 3319.171. *Cf. Lacy v. Dayton Bd. of Educ.*, 550 F. Supp. 835, 842 (S.D. Ohio 1982) (plaintiffs were employed under limited administrator contracts, which do not confer any entitlement to continued employment; O.R.C. § 3319.17 "removes any legitimate claim of entitlement, or expectancy that employment will continue") (citing *Dorian v. Euclid Bd. of Educ.*, 62 Ohio St.2d 182, 186 (1980) ("the suspension procedure under R.C. 3319.17 does not violate a teacher's right to due process of law")).

In addition, the fact that Defendant Johnson later gave plaintiff a negative preliminary and final evaluation does not convert his suspension into a disciplinary termination, as plaintiff contends. Instead, Defendant Johnson prepared these evaluations and accompanying letters simply to address the nonrenewal of plaintiff's contract.

*Johnson Depo. II*, pp. 111, 120-22. Section 3319.02 requires that the

Board (1) provide such evaluations prior to a decision to renew or not

renew the contract, and (2) provide plaintiff with the opportunity to

request a meeting with the Board.[23]   O.R.C. § 3319.02(D).   Plaintiff

---

[23]Specifically, section 3319.02 provides in relevant part:

(D) (1) Each board shall adopt procedures for the evaluation of
all assistant superintendents, principals, assistant principals,
and other administrators and shall evaluate such employees in
accordance with those procedures.  The evaluation based upon such
procedures shall be considered by the board in deciding whether to
renew the contract of employment of an assistant superintendent,
principal, assistant principal, or other administrator.

    (2) The evaluation shall measure each assistant
superintendent's, principal's, assistant principal's, and other
administrator's effectiveness in performing the duties included in
the job description and the evaluation procedures shall provide
for, but not be limited to, the following:

        (a) Each assistant superintendent, principal, assistant
principal, and other administrator shall be evaluated annually
through a written evaluation process.

        (b) The evaluation shall be conducted by the superintendent
or designee.

        (c) In order to provide time to show progress in correcting
the deficiencies identified in the evaluation process, the
evaluation process shall be completed as follows:

            (i) In any school year that the employee's contract of
employment is not due to expire, at least one evaluation shall be
completed in that year. A written copy of the evaluation shall be
provided to the employee no later than the end of the employee's
contract year as defined by the employee's annual salary notice.

            (ii) In any school year that the employee's contract of
employment is due to expire, at least a preliminary evaluation and
at least a final evaluation shall be completed in that year. A
written copy of the preliminary evaluation shall be provided to
the employee at least sixty days prior to any action by the board
on the employee's contract of employment.  The final evaluation
shall indicate the superintendent's intended recommendation to the
board regarding a contract of employment for the employee. A
written copy of the evaluation shall be provided to the employee
at least five days prior to the board's acting to renew or not
renew the contract.

*          *          *          *

(4) Before taking action to renew or nonrenew the contract of an

was provided these evaluations and was notified of his right to request a meeting with the Board, but did not exercise that right. Accordingly, Defendant Johnson's evaluations do not serve as a basis for wrongful termination. *See also* O.R.C. § 3319.02(D)(5) ("The establishment of an evaluation procedure shall not create an expectancy of continued employment. Nothing in division (D) of this section shall prevent a board from making the final determination regarding the renewal or nonrenewal of the contract of any. . . other administrator. . . .").

Plaintiff's reliance on *Pesek v. City of Brunswick*, 794 F. Supp. 768 (N.D. Ohio 1992) for the proposition that he is entitled to due process prior to suspension is therefore unavailing. *Pesek* is inapposite because it involved a disciplinary suspension, not a suspension pursuant to O.R.C. §§ 3319.02 and 3319.171. In addition, *Pesek* relied on cases that are distinguishable from the instant case because they involve classified employees and/or implicate a different state statute. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 535, 538-39 (1985) (finding that O.R.C. § 124.34 created a property interest of continued employment in plaintiff, a classified civil servant whose employment could be terminated only for cause);

---

assistant superintendent, principal, assistant principal, or other administrator under this section and prior to the last day of March of the year in which such employee's contract expires, the board shall notify each such employee of the date that the contract expires and that the employee may request a meeting with the board. Upon request by such an employee, the board shall grant the employee a meeting in executive session. In that meeting, the board shall discuss its reasons for considering renewal or nonrenewal of the contract. The employee shall be permitted to have a representative, chosen by the employee, present at the meeting.

O.R.C. § 3319.02(D).

*Boals v. Gray*, 775 F.2d 686, 697 n.12 (6th Cir. 1985) (rejecting a constitutional challenge to O.R.C. § 124.34 and relying on state case involving classified service employee) (citing *Jackson v. Kurtz*, 65 Ohio App.2d 152, 157-59 (1ˢᵗ Dist. Ct. App. 1979) (stating that such classified service employees "cannot be suspended for even one day without good cause (that is, for one of the causes specifically listed in R. C. 124.34)" and therefore suspensions of five days or less "may not be imposed in complete disregard of due process")).

Finally, plaintiff's suggestion that his due process rights were violated because he was the only person affected by the Suspension Policy is unavailing. Plaintiff cites to no statutory provision or case authority for the proposition that a policy enacted pursuant to O.R.C. §§ 3319.02 and 3319.171 must affect more than one employee. Without more, plaintiff's baseless assertions are insufficient to establish that he was vested with a constitutionally protected property interest that entitled him to the protections of due process. Plaintiff is therefore not entitled to summary judgment on his §1983 claim. *See, e.g.*, *McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1261 (6th Cir. 1990) ("[M]ere conclusory allegations are not sufficient to withstand a motion for summary judgment").

Accordingly, on plaintiff's first claim of denial of due process, *Defendants' Motion* is **GRANTED** and *Plaintiff's Motion* is **DENIED**.

### C. Plaintiff's Fraud and Misrepresentation Claims (Third and Fourth Claims)

Plaintiff alleges that defendants defrauded him because they did not intend (and/or later did not intend) that his contract be a legally binding document. *Am. Compl.* ¶¶ 19-22. Plaintiff further

alleges that defendants induced him into believing that his contract was a binding legal document, claiming that such inducement constitutes "negligent misrepresentation." *Id*. at ¶¶ 23-25. Defendants contend that there is no evidence that any of the defendants defrauded plaintiff or misrepresented to plaintiff that he had a contract.[24] Defendants further argue that plaintiff's contract was legally suspended in accordance with O.R.C. § 3319.171.

> In Ohio, the elements of fraud are:
>
> (a) a representation or, where there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance.

*Groob v. Keybank*, 108 Ohio St. 3d 348, 357 (2006) (quoting *Gaines v. Preterm-Cleveland, Inc.*, 33 Ohio St. 3d 54, 55 (1987)). In addition, "[a] tort claim based upon the same actions as those upon which a claim of contract breach is based will exist independently of the contract action only if the breaching party also breaches a duty owed separately from that created by the contract, that is, a duty owed even if no contract existed." *Textron Financial Corp. v. Nationwide Mut. Ins. Co.*, 115 Ohio App. 3d 137, 151 (Ohio Ct. App. 9th Dist. 1996).

As an initial matter, the Court questions whether plaintiff has alleged a tort claim independent from his breach of contract claim.

---

[24]Defendants also argue that plaintiff's contract was created by operation of law and that there was no evidence that the Board ever approved the contract. For the reasons discussed *supra*, the Court will not address these arguments here.

*See Id*.  However, even if he has properly alleged a tort claim, the Court concludes that plaintiff's fraud claim must fail.  Plaintiff has generally argued that defendants schemed to defraud him, but he has failed to establish the necessary elements of the alleged fraud.  Merely arguing that "it is clear" that a contract existed and that "there was an intention of misleading the Plaintiff" is not sufficient to establish an intent to mislead plaintiff.  Similarly, simply contending that a material misrepresentation exists[25] because defendants dispute the validity of plaintiff's written contract is not sufficient to establish fraud.  Moreover, plaintiff argues that his "injury is apparent," but he provides no evidence that he was injured simply because defendants suspended his contract in accordance with the Suspension Policy enacted pursuant to O.R.C. §§ 3319.02 and 3319.171.  Failure to provide a factual basis for conclusory allegations is fatal to plaintiff's fraud claim.

Plaintiff argues that even if the Court "determines that there was no fraud claim, it could still find a negligent misrepresentation action with regard to Plaintiff's employment."  *Plaintiff's Memo. Contra*, p. 27.  This Court disagrees.  "A claim for negligent misrepresentation requires the same elements as a claim for fraudulent inducement with the exception of the third element, which a plaintiff can meet in a negligent misrepresentation claim by showing that the defendant made the representation 'without reasonable care.'"  *Miami*

---

[25]Plaintiff relies on testimony of Mr. Grossman and Defendant Johnson and the *Regular Meeting Minutes* to establish that plaintiff had a contract, but as discussed *supra*, the Court will not address this issue again here. This testimony does nothing to establish any of the elements of a claim for fraud.

*Valley Paper, LLC v. Lebbing Eng'g & Consulting GMBH*, 2009 U.S. Dist.
LEXIS 25201, at *31 (S.D. Ohio Mar. 23, 2009) (quoting *Delman v.
Cleveland Heights*, 41 Ohio St. 3d 1, 4 (1989)). *See also Gentek Bldg.
Prods. v. Sherwin-Williams Co.*, 2005 U.S. Dist. LEXIS 45312, at *46
(N.D. Ohio Feb. 22, 2005) ("Negligent misrepresentation essentially
requires the same elements of proof as fraud, except that the
defendant's mental state is different.") (citing, *inter alia*, *Delman*,
41 Ohio St. 3d at 4)). Having failed to establish a claim for fraud
for the reasons discussed *supra*, plaintiff cannot establish a claim
for negligent misrepresentation. Defendants are therefore entitled to
summary judgment on these claims. As to plaintiff's third claim
(fraud) and fourth claim (misrepresentation), *Defendants' Motion* is
**GRANTED** and *Plaintiff's Motion* is **DENIED**.

> **D.  Plaintiff's Breach of Oral Contract / Promissory Estoppel
>     Claim (Fifth Claim)**

Plaintiff also asserts a claim for breach of oral contract or
promissory estoppel. *Am. Compl.* ¶¶ 26-32. More specifically,
plaintiff alleges that Bexley payroll manager Lauri Rieser promised
plaintiff in March 2006 that plaintiff's ex-wife would receive
continued health benefits at Bexley's expense. *Id.* at ¶¶ 27-28.
Plaintiff further alleges that Ms. Rieser advised him that "he needed
to wait until July of 2007 before making any changed [sic] in his
health insurance coverage." *Id.* at ¶ 28. Plaintiff complied, but
alleges that Bexley later deducted the amount of those premiums
($6,496.78) from money allegedly owed to plaintiff. *Id.* at ¶¶ 29-32.

Defendants move for summary judgment on this claim,[26] arguing that Ms. Rieser was acting within the scope of her employment for Bexley during the alleged conversations and that, under Ohio law, a claim of promissory estoppel will not lie against a political subdivision engaged in a governmental function. *Defendants' Motion*, pp. 21-22 (citing *Hortman v. Miamisburg*, 110 Ohio St.3d 194 (2006)). Plaintiff, however, contends that the function of payroll manager is a ministerial function, not a governmental one, and therefore defendants are not entitled to summary judgment on this claim. *Plaintiff's Memo. Contra*, pp. 27-28 (citing *Duvall v. City of Akron*, 1991 WL 231433 (1991)).

As an initial matter, the Court notes that, other than the unsubstantiated assertions in the *Amended Complaint*, plaintiff offers no evidence that Ms. Rieser ever made such representations to him. *Plaintiff's Memo. Contra*, pp. 27-28. Indeed, Ms. Rieser testified that she does not recall ever discussing with plaintiff benefits to his ex-wife. *Deposition of Lauri Rieser* ("*Rieser Depo.*"), Doc. No. 41, pp. 9-10, 17, 24. Plaintiff's unsubstantiated assertions in the *Amended Complaint* are insufficient to preclude summary judgment on this claim. *See*, *e.g.*, *Reeves v. Swift Transp. Co.*, 446 F.3d 637, 640 (6th Cir. 2006) (quoting Fed. R. Civ. P. 56(e)) ("The nonmovant must provide evidence beyond the pleadings setting 'forth specific facts showing that there is a genuine issue for trial.'").

In addition, Chapter 2744 of the Ohio Revised Code governs the

---

[26]Plaintiff has not moved for summary judgment on this claim.

tort liability of political subdivisions.[27]  O.R.C. § 2744.02(A)(1)

provides, in pertinent part, that political subdivisions are generally

not liable for damages:

> Except as provided in division (B) of this section, a
> political subdivision is not liable in damages in a civil
> action for injury, death, or loss to person or property
> allegedly caused by any act or omission of the political
> subdivision or an employee of the political subdivision in
> connection with a governmental or proprietary function.

Subdivision (B) of this statute provides exceptions to this immunity.

Specifically, it provides, *inter alia*, that political subdivisions are

liable for loss of property "caused by the negligent performance of

acts by their employees with respect to *proprietary* functions of

political subdivisions."[28]  O.R.C. § 2744.02(B) (emphasis added).

O.R.C. §§ 2744.01(C) and (G) distinguish between functions that are

either "governmental functions" or "proprietary functions."  The Ohio

Supreme Court has concluded that the doctrine of promissory estoppel[29]

is inapplicable against a state or its agencies in the exercise of a

governmental function.  *Hortman v. City of Miamisburg*, 110 Ohio St. 3d

194, 199 (2006).

---

[27]Here, the parties do not dispute that Bexley, Ms. Rieser's employer,
is a political subdivision.  *Am. Compl.* ¶ 3; O.R.C. § 2744.01(F) (defining
political subdivision to include a school district).

[28]This section provides other exceptions to the immunity of a political
subdivision, none of which are even arguably applicable here.  O.R.C. §
2744.02(B).

[29]The Ohio Supreme Court explains that,

where appropriate, the doctrine of promissory estoppel is
applicable and binding to oral employment-at-will agreements when
a promise which the employer should reasonably expect to induce
action or forbearance on the part of the employee does induce such
action or forbearance, if injustice can be avoided only by
enforcement of the promise.

*Mers v. Dispatch Printing Co.*, 19 Ohio St. 3d 100, 105 (1995).

Assuming that the alleged dialogue between plaintiff and Ms. Rieser occurred, the question is whether or not Ms. Rieser was engaged in a governmental function.[30] "'Governmental function' means a function of a political subdivision" that includes, *inter alia*, the provision of a system of public education. O.R.C. § 2744.01(C)(2)(c). Nevertheless, plaintiff contends that Ms. Rieser's position as payroll manager for Bexley was a ministerial proprietary function and therefore Bexley has no immunity on a claim for promissory estoppel. However, the only authority cited for this proposition does nothing to support plaintiff's argument. *Plaintiff's Memo. Contra*, pp. 27-28 (citing *Duvall*, 1991 WL 231433, at *2). *Duvall* states that "[p]roprietary functions involve the implementation and execution of governmental policy or planning" and specifically identifies the "maintenance, destruction, operation and upkeep of a sewer system" as a proprietary function. *Duvall*, 1991 WL 231433, at *2 (citing O.R.C. § 2744.01(G)(2), which identifies examples of proprietary functions). Other than quoting this portion of *Duvall*, plaintiff provides no explanation as to how Ms. Rieser's position involved "the implementation and execution of governmental policy or planning" or is otherwise comparable to the "maintenance, destruction, operation and upkeep of a sewer system." Moreover, plaintiff does not rely on any other provision under O.R.C. § 2744.01(G)(2) that identifies the work of a payroll manager for a school district as a proprietary function. This Court concludes that such work is a governmental function for which defendants are immune from liability on plaintiff's promissory

---

[30]Plaintiff does not argue that Ms. Rieser was acting outside the scope of her employment as Bexley's payroll manager.

estoppel claim. Defendants are therefore entitled to summary judgment on this claim. As to plaintiff's fifth claim (breach of oral contract/promissory estoppel), *Defendants' Motion* is **GRANTED**.

### E. Plaintiff's Conversion Claim (Sixth Claim)

Plaintiff asserts that Defendant Bexley withheld money that was lawfully due and owing to plaintiff and is, therefore, guilty of conversion.[31] *Am. Compl.* ¶¶ 3, 33-36. *See also Joyce v. General Motors Corp.*, 49 Ohio St. 3d 93, 96 (1990) ("[C]onversion is the wrongful exercise of dominion over property to the exclusion of the rights of the owner, or withholding it from his possession under a claim inconsistent with his rights."). Plaintiff apparently bases this claim on the amount withheld in connection with payment of premiums for health insurance coverage for his ex-wife. *Id*. at ¶¶ 31-36. Defendants argue that plaintiff's conversion claim must fail because it is based on an untenable claim of promissory estoppel.

Defendants' argument is well-taken. As discussed *supra*, provision of a public school system is a governmental function and there is no evidence that Ms. Rieser was engaged in a proprietary function. Because there can be no tort liability under Ohio law for the performance of a governmental function, plaintiff's conversion claim must fail. Accordingly, as to plaintiff's sixth claim (conversion), *Defendants' Motion* is **GRANTED**.

### F. Plaintiff's Wrongful Termination in Violation of Public Policy Claim (Seventh Claim)

---

[31]Plaintiff has not moved for summary judgment on this claim "because there was a dispute with regard to the facts[.]" *Plaintiff's Memo. Contra*, p. 28.

Plaintiff alleges that his employment was terminated in violation of Ohio public policy. *Am. Compl.* ¶¶ 37-44. More specifically, plaintiff argues that he was not terminated for any specified reason contained in the Suspension Policy with the exception of a suspension based on "any other reason that the Board deems is in the best interest of the district," which is impermissible under O.R.C. § 3319.171. *Id*. at ¶ 40-41; *Plaintiff's Memo. Contra*, p. 29 (incorporating by reference "factual statements" from *Am. Compl.* ¶¶ 37-44 and *Plaintiff Aff.* ¶¶ 1-47). Plaintiff contends that this reason contravenes the statute and is therefore void. Plaintiff further argues that his "termination" is ineffective because he did not receive a signed copy of the resolution suspending his contract. *Id*.

Defendants contend that plaintiff's contract was suspended for the reasons specifically articulated in the resolutions adopted during the special meeting of May 7, 2007, *i.e.*, abolishment of position due to lack of need or work. *Defendants' Motion*, p. 23 (quoting *Special Meeting Minutes*, p. 2). Defendants argue that O.R.C. § 3319.171 does not prohibit this purpose and does not limit the reasons for which a school board may suspend a contract. *Id*. at 23-24. Defendants further contend that plaintiff has not identified what public policy they allegedly violated in suspending plaintiff's contract.

This Court agrees. In order to state a claim of wrongful discharge in violation of public policy, "a plaintiff must allege facts demonstrating that the employer's act of discharging [him] contravened a 'clear public policy.'" *Painter v. Graley*, 70 Ohio St.3d 377, 383 (1994). In considering the sufficiency of an

allegation of wrongful termination, courts applying Ohio law must consider whether: (1) clear public policy was manifested in a state or federal constitution, statute, or common law; (2) termination of employees under circumstances such as those alleged in a plaintiff's complaint would jeopardize that manifested public policy; (3) the termination of this plaintiff's employment was allegedly motivated by conduct related to that public policy; and (4) the employer lacked an overriding legitimate business justification for the termination of that employment. *Id.; Bickers v. W. & S. Life Ins. Co.*, 116 Ohio St. 3d 351, 355 (2007).

Here, as discussed *supra*, plaintiff's contract was suspended in accordance with O.R.C. § 3319.171, which does not prohibit suspension of a contract because of lack of need or work. In addition, plaintiff does not identify what "clear public policy" defendants allegedly violated when they suspended his contract. Failure to do so is fatal to plaintiff's claim. *See*, *e.g.*, *Cochran v. Columbia Gas of Ohio, Inc.*, 138 Ohio App. 3d 888, 895 (10th Dist. Ct. App. 2000) (affirming a grant of summary judgment against appellant, where the court had determined, *inter alia*, that appellant did not identify any other source of "clear public policy" to maintain a wrongful discharge claim). Moreover, even if plaintiff had identified a clear public policy, his claim still fails because he does not establish the other three elements necessary to his public policy claim. *See*, *e.g.*, *Harris v. Blockbuster, Inc.*, 2009 U.S. Dist. LEXIS 86478, at *12-13 (S.D. Ohio Sept. 1, 2009) (concluding that plaintiff "has no colorable cause of action" for wrongful discharge); *Cramer v. Fairfield Med. Ctr.*, 182 Ohio App. 3d 653, 666 (5th Dist. Ct. App. 2009) ("It was

appellant's burden to indicate the specific public policy at issue and to establish how that clear public policy was violated by his termination.") (internal quotation marks and citations omitted). Accordingly, as to plaintiff's seventh claim (wrongful termination in violation of public policy), *Defendants' Motion* is **GRANTED** and *Plaintiff's Motion* is **DENIED**.

### G. Plaintiff's Libel and Slander Claims (Eighth Claim)

Plaintiff alleges that defendants defamed him. *Am. Compl.* ¶¶ 45-57; *Plaintiff's Motion*, pp. 30-36. Plaintiff identifies three allegedly defamatory communications: (1) a conversation with the Bexley Police Department; (2) a report filed by Defendant Zwick with the Bexley City Police Department ("*Bexley Police Report*"); and (3) an email dated May 8, 2007, from Defendant Johnson to Pam Moenter, a Bexley employee (attached as Exhibit E to *Am. Compl.*) ("Defendant Johnson's email"). *Id.* The Court shall address each communication in turn.

#### 1. Standard

"Defamation is a false publication causing injury to a person's reputation, or exposing him to public hatred, contempt, ridicule, shame or disgrace, or affecting him adversely in his trade or business." *Matalka v. Lagemann*, 486 N.E.2d 1220, 1222 (10th Dist. Ct. App. 1985). Under Ohio law, a plaintiff must set forth the following elements in order to establish a claim for defamation, which includes both libel and slander:[32]

---

[32]Libel generally refers to written or printed words, while slander usually refers to spoken words. *Lawson v. AK Steel Corp.*, 121 Ohio App. 3d 251, 256 (12th Dist. Ct. App. 1997).

(a) a false and defamatory statement concerning another;

(b) an unprivileged publication to a third party;

(c) fault amounting at least to negligence on the part of the publisher; and

(d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication.

*Akron-Canton Waste Oil v. Safety-Kleen Oil Servs.*, 611 N.E.2d 955, 601 (9th Dist. Ct. App. 1992) (quoting *3 Restatement of the Law 2d, Torts* (1977) 155, § 558) (internal quotation marks omitted)). "Publication of defamatory matter is its communication intentionally or by a negligent act to one other than the person defamed." *Hecht v. Levin*, 66 Ohio St. 3d 458, 460 (1993) (quoting 3 Restatement of the Law 2d, Torts (1965), Section 577(1) (internal quotation marks omitted)).

"If a claimant establishes a prima facie case of defamation, a respondent may then invoke a conditional or qualified privilege." *Jackson v. City of Columbus*, 117 Ohio St. 3d 328, 331 (2008). "The essential elements of a conditionally privileged communication may accordingly be enumerated as good faith, an interest to be upheld, a statement limited in its scope to this purpose, a proper occasion, and publication in a proper manner and to proper parties only." *Hahn v. Kotten*, 43 Ohio St.2d 237, 246 (1975). *See also A & B Abell Elevator Co., Inc. v. Columbus/Central Ohio Bldg. & Constr. Trades Council*, 73 Ohio St.3d 1, 8 (1995) ("A publication is privileged when it is 'fairly made by a person in the discharge of some public or private duty, whether legal or moral, or in the conduct of his own affairs, in matters where his interest is concerned.'"). "A qualified privilege is recognized in many cases where the publisher and the recipient have a

common interest, and the communication is of a kind reasonably calculated to protect or further it." *Hahn*, 43 Ohio St.2d at 244. In addition, qualified privilege protects the "public interest" privilege, which "involves communications made to those who may be expected to take official action of some kind for the protection of some interest of the public." *A & B Abell*, 73 Ohio St. 3d at 9 (internal citations and quotation marks omitted).

A plaintiff may defeat a claim to qualified privilege only by proving "with convincing clarity that a publisher acted with actual malice." *Jackson*, 117 Ohio St.3d at 331. "Actual malice" is "acting with knowledge that the statements are false or acting with reckless disregard as to their truth or falsity." *Id*. (quoting *Jacobs v. Frank*, 60 Ohio St.3d 111, paragraph two of the syllabus (1991)) (internal quotation marks omitted)). "The phrase 'reckless disregard' applies when a publisher of defamatory statements acts with a 'high degree of awareness of their probable falsity,' . . . . or when the publisher 'in fact entertained serious doubts as to the truth of his publication.'" *Id*. (internal citations omitted).

## 2. Conversation with the Bexley police department

Plaintiff appears to contend that defendants defamed him when "Defendant Zwick contacted the police under the direction of Defendant Johnson to say that the Plaintiff had taken the hard drive of the computer system." *Plaintiff's Motion*, p. 15. When Defendant Johnson first spoke with plaintiff about his suspension and discussed the return of school property, plaintiff did not advise Defendant Johnson that he --plaintiff-- had taken the hard drive from the school. *Johnson Depo. I*, pp. 38-42. When he discovered that the hard drive

was missing, Defendant Johnson worried that the integrity of Bexley's school computer system was or would be compromised and he tried to protect the school district and the system. *Id*. at 43. At Defendant Johnson's direction, Defendant Zwick called the Bexley police department on May 9, 2007, and requested to meet with a police officer at the school. *Zwick Depo.*, pp. 34-36. Defendant Zwick testified that he had seen the video of plaintiff entering the building at night and that he called the police to report "[p]ossible criminal behavior," *i.e.,* that a hard drive was missing. *Id*. at 33-37. Officer Wayne of the Bexley police department met with Defendant Zwick and took a report regarding the disappearance of the hard drive. *Id.; Wayne Depo.*, pp. 7-11. The Bexley Police Report the complaint as breaking and entering. Exhibit D, attached to *Am. Compl.* Although Defendant Zwick identified plaintiff by name and provided a physical description, plaintiff's name did not appear on the Bexley Police Report. *Johnson Depo. I*, p. 87; *Zwick Depo.*, pp. 39-40; *Bexley Police Report.* Defendants Johnson and Zwick both testified that they wanted to report the missing hard drive and that it was not their responsibility to determine whether or not a crime had actually occurred. *Johnson Depo. I*, pp. 43-44; *Zwick Depo.*, pp. 37-38. Defendant Zwick also believed that it was the duety of the Bexley police to investigate this incident. *Zwick Depo.*, p. 37.

Assuming that plaintiff has established a *prima facie* case of defamation as to this communication, the question becomes whether or not Defendants Johnson and Zwick are entitled to qualified immunity. The Court concludes that they are so entitled. Qualified privilege extends, *inter alia*, to communications made to those who may be

60

expected to take official action of some kind for the protection of some interest of the public. *A & B Abell*, 73 Ohio St. 3d at 9. Here, the public has an interest in preserving the integrity of school computer systems. Defendants Johnson and Zwick contacted the Bexley police to investigate the disappearance of the missing hard drive and to protect Bexley's computer system. This is a legitimate public interest and, accordingly, defendants are entitled to qualified immunity as to this communication.

The fact that plaintiff was unhappy about this communication and that there is no evidence that he was ever charged or found guilty of a crime does not change this result. In addition, plaintiff contends that the timing of Defendant Zwick's communication indicates an improper motive because Defendant Zwick contacted the Bexley police department on May 9, 2007, the day *after* plaintiff advised Defendant Johnson that plaintiff possessed the missing hard drive and would return it. Contrary to plaintiff's suggestion, however, the timing of the communication does not establish actual malice sufficient to overcome the application of qualified immunity. Defendant Johnson swore under oath that he had simply forgotten to mention to Defendant Zwick that he-- Defendant Johnson-- had spoken to plaintiff because it was late in the afternoon of May 8th and Defendant Johnson was out of the office on May 9th for a conference. *Johnson Aff*. ¶ 4. Similarly, Defendant Zwick swore that at the time that he signed the Bexley Police Report on May 9th, and necessarily at the time that he made the earlier call to the Bexley police, he did not know about Defendant Johnson's conversation with plaintiff about returning the hard drive. *Affidavit of Barry P. Zwick* ¶ 4 ("*Zwick Aff.*"). In addition,

Defendant Zwick swore that it was not unusual to report missing property; he had in fact reported missing computers to the police in 2006. *Id*. at ¶ 3. Other than his own speculation and personal opinion, which is insufficient, plaintiff offers nothing to rebut this sworn testimony. According, he has failed to establish that either Defendants Johnson or Zwick acted with actual malice when the Bexley police department was contacted. *See Jackson*, 117 Ohio St.3d at 331. Therefore, defendants are entitled to qualified immunity as to this communication.

### 3. Bexley Police Report

Plaintiff also contends that the Bexley Police Report defamed him. As an initial matter, the Court questions whether plaintiff can establish a *prima facie* case of defamation based on the report because the report does not identify him by name. *See* Exhibit D, attached to *Am. Compl.* However, even if plaintiff could establish a *prima facie* case, the Court concludes that plaintiff's claim still fails. For the reasons discussed *supra*, defendants are entitled to qualified immunity as to the Bexley Police Report.

### 4. Defendant Johnson's email

Finally, plaintiff argues that Defendant Johnson's email defamed him. That email reads in pertinent part:

> Curtis called me late this afternoon and seemed to be
> waiving [sic] the white flag. I think that we can quit
> treating him as someone who will be a danger to our
> operations. I would like to temporally [sic] restore an
> EMAIL address for him if possible, so that we can
> communicate. His phone is disconnected and he called me on
> his wife's cell phone.

Exhibit E to *Am. Compl.*

This communication serves as an insufficient basis for a defamation claim. "[A] communication made in good faith on a matter of common interest between an employer and an employee, or between two employees concerning a third employee, is protected by qualified privilege." *Knox v. Neaton Auto Prods. Mfg.*, 375 F.3d 451, (6th Cir. 2004) (citing *Evely v. Carlon Co., Div. of Indian Head, Inc.*, 4 Ohio St. 3d 163, 165, 166 (1983)). *See also Gray v. Allison Div., General Motors Corp.*, 52 Ohio App. 2d 348, 351 (8th Dist. Ct. App. 1977) ("It is well established in Ohio that communications between an employer and an employee or between two employees concerning the conduct of a third or former employee made in good faith concerning a matter of common interest are within the doctrine of qualified privilege."). Plaintiff has not established that Defendant Johnson acted with actual malice in sending this email. Accordingly, as to plaintiff's Claim 8 (libel and/or slander), *Plaintiff's Motion* is **DENIED** and *Defendants' Motion* is **GRANTED**.[33]

### H. Plaintiff's Intentional Infliction of Emotional Distress Claim (Ninth Claim)

Plaintiff alleges that defendants acted in an extreme and outrageous manner, which resulted in plaintiff's severe emotional distress, embarrassment and humiliation. *Am. Compl.* ¶¶ 58-60. More specifically, plaintiff appears to complain that defendants caused him emotional distress on two occasions: (1) when Defendant Johnson telephoned plaintiff to advised plaintiff that he had been suspended;

---

[33]Having concluded that defendants are entitled to summary judgment on this claim based on the Bexley Police Report, the Court will not address whether or not defendants are also entitled to absolute immunity in making police reports.

and (2) when the Marysville police visited plaintiff's home as a result of defendants' communications with the Bexley police department.  *Plaintiff's Motion*, pp. 17-18.

### 1.  Standard

Under Ohio law, "'one who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.'" *Yeager v. Local Union 20*, 6 Ohio St.3d 369, 374 (1983) (quoting *Restatement of the Law 2d, Torts* (1965) 71, § 46(1) (internal quotation marks omitted)).

In order to establish a claim for intentional infliction of emotional distress, a plaintiff must establish the following elements:

> (1) that the actor either intended to cause emotional distress or knew or should have known that actions taken would result in serious emotional distress to the plaintiff, (2) that the actor's conduct was so extreme and outrageous as to go beyond all possible bounds of decency and was such that it can be considered as utterly intolerable in a civilized community, (3) that the actor's actions were the proximate cause of the plaintiff's psychic injury, and (4) that the mental anguish suffered by the plaintiff is serious and of a nature that no reasonable man could be expected to endure it.

*Burkes v. Stidham*, 107 Ohio App. 3d 363, 375 (8th Dist. Ct. App. 1995).  The Ohio Supreme Court has described the meaning of "serious" emotional distress:

> By the term serious, we of course go beyond trifling mental disturbance, mere upset or hurt feelings.  We believe that serious emotional distress describes emotional injury that is both severe and debilitating. . . .  A non-exhaustive litany of some examples of serious emotional distress should include traumatically induced neurosis, psychosis, chronic depression, or phobia.

*Paugh v. Hanks*, 6 Ohio St.3d 72, 78 (1983).

In order to meet the second element of "extreme and outrageous" conduct, "[o]nly the most extreme wrongs, which do gross violence to the norms of a civilized society, will rise to the level of outrageous conduct." *Brown v. Denny*, 72 Ohio App. 3d 417, 423 (2nd Dist. Ct. App. 1991). Indeed, "it appears that only rarely will offensive conduct reach the level necessary to support a claim for intentional infliction of emotional distress." *Scarabino v. E. Liverpool City Hosp.*, 155 Ohio App. 3d 576, 579 (7th Dist. Ct. App. 2003).

"While Ohio does not require expert medical testimony to support an intentional infliction of emotional distress claim, a plaintiff must at least provide some evidence beyond his or her own testimony." *Talley v. Family Dollar Stores of Ohio, Inc.*, 2008 U.S. App. LEXIS 19342, at *28 (6th Cir. Sept. 11, 2008) (citing *Buckman-Peirson v. Brannon*, 159 Ohio App. 3d 12, 25 (2nd Dist. Ct. App. Nov. 16, 2004)). Therefore, a plaintiff's mere assertion is insufficient to establish serious emotional distress. *Id.* ("Simply stated, Talley's own assertion and her sister's affidavit [that plaintiff cries frequently and otherwise appears to be depressed] do not provide evidence of serious emotional distress.").

### 2. Defendant Johnson's telephone call

On May 8, 2007, Defendant Johnson telephoned plaintiff to notify him that plaintiff's position had been abolished because of lack of need, effective immediately. *Johnson Depo. I*, pp. 36-38; *Plaintiff Depo.*, pp. 48-54. Defendant Johnson advised plaintiff that he was not permitted on school premises absent permission from Defendant Johnson. *Johnson Depo. I*, p. 38; *Plaintiff Depo.*, pp. 48-49. When this short telephone conversation ended, plaintiff began to shake and become

pale. *Mason Aff.* ¶ 31; *Amy Mason Aff*. ¶ 4. After learning the content of this conversation, plaintiff's wife called Defendant Johnson and asked if he was trying to give her husband a heart attack. *Amy Mason Aff*. ¶ 4. Although it is unclear whether it was the result of the telephone call or the subsequent visit from the Marysville police, plaintiff's wife avers that plaintiff was "suffering severe depression"; that she saw him "crying uncontrolably [sic] on many occasions"; that he "stayed in bed for two or three weeks"; and that she accompanied him to a physician, who prescribed an antidepressant. *Amy Mason Aff*. ¶ 5. Plaintiff contends that Defendant Johnson's telephone call, or the notice that his position had been abolished, gives rise to a claim of intentional emotional distress.

This Court disagrees. First, "an employer is not liable for a plaintiff's emotional distress if the employer does no more than 'insist upon his legal rights in a permissible way, even though he is well aware that such insistence is certain to cause emotional distress.'" *Mendlovic v. Life Line Screening of Am., Ltd.*, 173 Ohio App. 3d 46, 58 (8th Dist. Ct. App. 2007) (quoting *Foster v. McDevitt*, 31 Ohio App.3d 237, 239 (1986)). *See also Webb v. Ohio Casualty Ins. Co.*, 1990 Ohio App. LEXIS 1465, at *6-7 (12th Dist. Ct. App. April 16, 1990) (granting summary judgment in favor of employer on claim for intentional infliction of emotional distress where employer's criticism was harsh and unfair). Here, as discussed *supra*, defendants abolished plaintiff's position as a result of the findings and recommendations of the *Haskell Report* pursuant to O.R.C. §§ 3319.02 and 3319.171. Plaintiff offers no argument or evidence sufficient to persuade the Court, or indeed any fact-finder, that the abolition of

plaintiff's position and his subsequent suspension present the most extreme wrong or rare offensive conduct necessary to support his claim. *See Brown*, 72 Ohio App. 3d at 423; *Scarabino*, 155 Ohio App. 3d at 579.

Plaintiff's reliance on *Russ v. TRW, Inc.*, 59 Ohio St. 3d 42 (1991), apparently for the proposition that a claim for emotional distress is not foreclosed simply because a discharge may have been obtained in a lawful manner, does not change this result. In *Russ*, the defendant employer, *inter alia*, mislead the plaintiff employee into believing illicit pricing practices were legitimate and presented the plaintiff as a target of a federal investigation. *Id*. at 47-48. This offending behavior, unrelated to the plaintiff's termination, caused the *Russ* plaintiff's severe emotional distress. *Id*. *Russ* is distinguishable from this case and does not save the instant plaintiff's claim.

In addition, as discussed *supra*, plaintiff's anguish must reach a level that no reasonable man could be expected to endure. Implicit in this condition is the consequent inability to participate in the regular activities of life, including job responsibilities. *See*, *e.g.*, *Cokely v. Smith*, 2007 Ohio 5650, at *22-23 (2nd Dist. Ct. App. Oct. 19, 2007) (finding that, *inter alia*, the plaintiff's distress did not prevent him from engaging in productive work). Here, although there is evidence from plaintiff's wife that plaintiff suffered emotionally after learning of his suspension from Defendant Johnson, plaintiff admits, *inter alia*, that he began working as a network engineer for Franklin Computer Services Group ("Franklin") on June 1, 2007, *i.e.*, shortly after his Bexley suspension became effective.

*Plaintiff Depo.*, pp. 27-28, 168. Indeed, plaintiff testified that he was able to perform these new job duties normally, that Franklin was "thrilled to have me," and that he missed only one day of work in late July. *Id*. at 168. Notwithstanding some distress, inconvenience and hurt feelings, the record reflects that plaintiff was able to participate in regular activities of life, including work. Accordingly, Defendant Johnson's telephone call notifying plaintiff of his suspension cannot serve as a basis for a viable claim of intentional infliction of emotional distress.

### 3. Visit from Marysville police

Plaintiff also contends that defendants' contact with the Bexley police -- which led to a visit by the Marysville police to plaintiff's residence -- supports a claim for intentional infliction of emotional distress. Again, this Court disagrees. As discussed *supra*, defendants' concern for the integrity of the Bexley computer system prompted them to contact the Bexley police. Plaintiff offers no persuasive argument or evidence that this action was "so extreme and outrageous as to go beyond all possible bounds of decency." However, even if defendants' conduct was extreme, plaintiff's claim would still fail because he has not offered evidence that the distress he suffered was sufficiently severe or otherwise interfered with his ability to perform routine activities, including work. Therefore, this Court concludes that plaintiff has not pointed to a genuine issue of material fact sufficient to meet the high standard with respect to his claim of intentional infliction of emotional distress. Accordingly, on plaintiff's ninth claim (intentional infliction of emotional distress), *Plaintiff's Motion* is **DENIED** and *Defendants' Motion* is

**GRANTED.**

## I.   Defendants' Counterclaim

Defendants allege that plaintiff acted in breach of his employment contract and/or the implied contractual covenant of good faith and loyalty when he (1) "reviewed quotes for a useless number of software (upgrade) user licenses and failed to install those licenses that the [Bexley School] District could use after he received them"; and (2) "failed to purchase software user licenses for 539 of the [Bexley] School District's computers."  *Amended Answer and Counterclaim to the First Amended Complaint* (*"Counterclaim"*) ¶¶ 15-18. Plaintiff denies liability and seeks summary judgment on defendant's *Counterclaim*.

### 1.   Background

#### a.   Purchase of upgrade licenses

On January 14, 2002, the Board approved the purchase of 600 Microsoft Windows XP Pro User Licenses ("upgrade licenses") from Educational Resources.  Exhibit C, attached to *Counterclaim*.  The Board ordered the upgrade licenses on January 29, 2002, and paid $28,800 for 600 of the licenses at the rate of $48 per license.  *Id.*; Exhibits D, E and F, attached to *Counterclaim*.

In approximately October 2007, Paul Ross, Bexley's new Technology Director, conducted an inventory of the Board's licenses and discovered serial numbers for the 600 upgrade licenses.  *Deposition of Paul Adrian Ross*, Doc. No. 46 ("*Ross Depo.*"), pp. 38-39, 43; *Affidavit of Paul Ross* ("*Ross Aff.*") ¶¶ 1-2.  Mr. Ross determined that 45 of Bexley's computers had full Windows licenses, but he could salvage

about 325 of the 600 unused upgrade licenses by installing them on computers that already had existing operating system licenses. *Ross Aff.* ¶ 3. Mr. Ross concluded that the 275 remaining unused upgrade licenses, for which Bexley paid $13,200, "were worthless to the Board, because its other computers had no Windows licenses." *Id.* at ¶¶ 4-5.

### b. Failure to purchase Windows licenses

In the course of his operational assessment, Mr. Ross also discovered that plaintiff "had not obtained Windows operating system licenses for 539 of the Board's computers and declined opportunities to purchase computers with pre-installed licenses." *Ross Aff.* ¶ 6. According to Mr. Ross, the "Board acted to mitigate liability exposure by purchasing a Windows volume licensing agreement, retiring older computers that did not have licenses and purchasing new computers with pre-installed licenses." *Id.* at ¶ 7.

### 2. Standard

The parties agree that Ohio law applies to this claim. As discussed *supra*, in order to prevail on a breach of contract claim under Ohio law, a party must establish (1) the existence of a contract, (2) performance by one party; (3) breach by the other party; and (4) damage or loss to the performing party. *See*, *e.g.*, *Thomas v. Publishers Clearing House, Inc.*, No. 00-3948, 29 Fed. Appx. 319, 2002 U.S. App. LEXIS 2069, at *5 (6th Cir. Feb. 5, 2002) (citing *Doner v. Snapp*, 98 Ohio App. 3d 597, 649 N.E.2d 42, 44 (2nd Dist. Ct. App. 1994)).

In addition, in Ohio "it is an implied condition of employment that an employee will carry out his duties in good faith and not act

to the detriment of his employer." *Staffilino Chevrolet, Inc. v. Balk*, 158 Ohio App. 3d 1, 14 (7th Dist. Ct. App. 2004). Therefore, an "employer may sue the employee for breaching this duty of good faith and loyalty." *Id*. at 14-15.

### 3. Discussion

In the instant case, the parties disagree whether plaintiff acted in breach of either his contract[34] or the implied duty of good faith and loyalty. Plaintiff denies wrongdoing on his part because (1) he was not involved in the purchase of the upgrade licenses, but that other employees, namely Scott Bushman and Dr. Hyland, were the ones involved in the purchase, and (2) he was a loyal, hard-working employee. *Plaintiff's Motion*, pp. 2-5 (citing, *inter alia*, *Hyland Depo.*, pp. 84-86, 105); *Plaintiff Aff*. ¶¶ 43-47; *Plaintiff's Memo. Contra*, pp. 3-8 (citing, *inter alia*, *Ross Depo.*, pp. 38-39, 41-46; *Hyland Depo.*, p. 103).

As Bexley's Network Systems Manager from January 29, 1996, to May 21, 2007, plaintiff was responsible for, *inter alia*, the "[s]etup and install[ation of] new equipment on LAN and individual PC's," "evaluat[ing] software," and "filling orders and delivery[.]" *Counterclaim* ¶ 5; Exhibit B, attached thereto; *Plaintiff Depo.*, p. 13. These duties were to "be [performed] at the discretion of the Technology Coordinator." Exhibit B, attached to *Counterclaim*.

Plaintiff essentially contends that Dr. Hyland is the Technology Coordinator because he worked under her supervision. However, Dr. Hyland described her position over the past 22 years as Bexley's

---

[34]To the extent that any party questions whether or not plaintiff had a valid written contract, that issue is addressed *supra*.

"Director of Curriculum." *Hyland Depo.*, pp. 12-13. If plaintiff
needed a product, he would ask Dr. Hyland for the product and she
would write the purchase order. *Hyland Depo.*, pp. 114-15. It is
clear that Dr. Hyland relied on Bexley's technology department to
advise her what was needed and how to meet that need. *Id.* at 115.
Indeed, Mr. Haskell reported that plaintiff "is seen as the de facto
head of IT." *Haskell Report*, p. 7. Dr. Hyland has no recollection of
the purchase of 600 upgrade licenses in 2002. *Hyland Depo.*, at 118.
Under these circumstances, it is not entirely clear to the Court who
Bexley's "Technology Coordinator" was at the relevant time period and
what role, if any, plaintiff played in the purchase of the upgrade
licenses and Windows licenses.

In addition, during the course of his operational assessment in
2007, Mr. Ross discovered the name of Scott Bushman, a technology
coordinator for Bexley, on the original purchase order for the
licenses and advised Defendant Johnson of this discovery. *Ross Depo.*,
pp. 41-44; *Plaintiff Depo.*, p. 121. However, Mr. Ross was uncertain
who initiated the purchase. *Ross Depo.*, p. 42. Later, plaintiff
advised Mr. Ross that it was Mr. Bushman who made the purchase of the
600 upgrade licenses. *Id.* at 43-44. Plaintiff denies any involvement
in the purchase of the upgrade licenses and insists that it was Mr.
Bushman, along with Dr. Hyland, who were involved in this purchase.
*Plaintiff Aff.* ¶ 44. Moreover, Mr. Ribble, a Bexley technology
department employee, believed that Dr. Hyland was involved in
licensing decisions because she oversaw the technology department.
*Deposition of John D. Ribble II* ("*Ribble Depo.*"), pp. 10-11.

Based on the current record, the Court cannot confidently

determine whether or not plaintiff was responsible for purchasing the 600 upgrade licenses and, whether he acted in breach of his contract or duties owed to defendants.  Similarly, there is insufficient evidence for the Court to determine whether or not plaintiff breached a duty in failing to obtain Windows operating system licenses for 539 of the Board's computers and in declining opportunities to purchase computers with pre-installed licenses.  Accordingly, as to defendants' *Counterclaim*, *Plaintiff's Motion* and *Defendants' Motion* are **DENIED**.


**WHEREUPON**, *Plaintiff Curtis Mason's Motion for Summary Judgment*, Doc. No. 48, is **DENIED** as to all of plaintiff's claims against all defendants and **DENIED** as to defendants' counterclaim.  The *Motion for Summary Judgment by Defendants*, Doc. No. 51, is **GRANTED** as to all of plaintiff's claims against all defendants and **DENIED** as to defendants' counterclaim against plaintiff.


March 15, 2010                    *s/Norah McCann King*
                                   Norah M$^c$Cann King
                           United States Magistrate Judge